LEROY C. GRIFFITH, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Griffith v. Commissioner
Docket Nos. 22089-80; 4032-85.
United States Tax Court
T.C. Memo 1988-445; 1988 Tax Ct. Memo LEXIS 468; 56 T.C.M. (CCH) 220; T.C.M. (RIA) 88445; September 19, 1988; As amended January 9, 1989 Theodore Brill and William H. Karo, for the petitioner. Sharon Armuelles and Andrew Vanore, III, for the respondent. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION PARR, Judge: In his 121 page statutory notice respondent determined the following deficiencies against petitioner individually: Sec. 6653(b) [1]
Year
Deficiency
Additions to Tax
1969
$      60
$     30
1970
60
30
1972
25,968
12,984
1973
3,136
1,568
1974
105,947
52,974
1975
148,429
74,215
1976
137,275
68,638
1977
73,983
36,992
1978
122,937
61,469
*474 Several years later respondent determined the following deficiencies against petitioner as transferee of GTI Productions, Inc. (sometimes hereinafter GTI): [2]
Sec. 6653(b)
Year Ending
Deficiency
Addition to Tax
March 31, 1975
$ 35,283
$ 18,251
March 31, 1976
48,532
24,266
March 31, 1977
20,051
10,026
After concessions, [3] we must decide the following issues: [4]
1. Whether the Forms 872 signed by petitioner's accountant effectively extended the statute of limitations for the assessment and collection of tax for the 1974 and 1975 taxable years; 2. Whether petitioner has substantiated his entitlement to:
(a) deductions respondent disallowed, [5] (b) unclaimed deductions asserted in an amendment to his petition, and (c) additional deductions for amounts which were miscategorized as travel and entertainment expenses; 3. Whether petitioner has realized additional income (apart *475 from the disallowed deduction): (a) from Bee Gee, Inc. in 1974 and 1975, in the amounts of $ 4,400 and $ 21,700; from Cameo Productions in the amounts of $ 2,097, and $ 3,100 in 1975 and 1976, respectively; and $ 3,262 from the Flamingo Theater in 1976, (b) from dividends received from GTI Products, Inc. in 1974 and 1975 in the respective amounts of $ 8,254 and $ 38,947, and (c) from the return of a security deposit on the Paramount Theater in 1977; 4. Whether petitioner has substantiated Gayety Theater's entitlement to depreciation, maintenance and repair deductions for the residence at 4460 Bay Point Rd., Miami, Fla.; [6]
5. Whether petitioner's basis in Paris Follies, Inc. is increased by shareholder loans, thereby entitling petitioner to loss deductions in 1975 and 1976; 6. Wether petitioner is entitled to head of household filing status and income averaging for all the years in issue; 7. Whether petitioner is entitled to carrybacks in 1969, 1970, 1971 and 1973 and to carryforwards in 1976 and 1978; 8. Whether petitioner sustained additional deductible losses on the liquidation of Ninth Street Amusements, Inc., Adam and Eve Theaters, Inc. and Carib Theater Productions, *476 Inc.; 9. Whether petitioner is liable as transferee of GTI Productions, Inc.; and 10. Whether petitioner is liable for fraud both individually and as transferee of GTI Productions, Inc. for all the years in question. *477 GENERAL FINDINGS OF FACT The parties to these cases have submitted 122 pages of stipulated facts in the form of a stipulation, a supplemental stipulation and a second supplemental stipulation. To the extent stipulated, those facts along with the related exhibits, are found, and incorporated herein by this reference. Many of the more important stipulated facts as well as the Court's additional findings are set forth below. The background section introduces the many people involved in this complex array of transactions and the business structure (to the extent possible) of the numerous theaters and corporations operated by petitioner. [7] Thereafter, each issue is discussed separately with more specific findings set forth as necessary. *478 Background
Petitioner lived in Florida when he filed his individual original petition and his petition as transferee of GTI Productions. Petitioner is in his mid-fifties and has a sixth-grade education. Petitioner started in the theater business when he left school in 1949. He began as a projectionist, cashier and usher at the local theater in his hometown. A short time later he worked concessions for Oscar Markovich at the Grand Theater in St. Louis, Mo. Petitioner was drafted into the armed services in 1955. After an early discharge he opened his first theater in Portland, Ore. The theater only stayed open a short time. After limited operation of a restaurant in Kansas City, Mo. and another period of short term employment with Oscar Markovich, petitioner opened a theater in Detroit, Mich. Three or four years later, in 1962, petitioner moved to South Florida where he started the conglomerate of entities involved in these cases. During the years in question, petitioner was the sole shareholder of six electing small business ("subchapter S") corporations and two regular ("C") corporations. Most of the corporations operated more than one theater. Petitioner's *479 business was devoted primarily to providing "adult" entertainment, although a few of petitioner's theaters provided burlesque and vaudeville type shows. All of petitioner's subchapter S corporations and one of his C corporations operated movie and/or live theaters. The other C corporation, GTI Productions, Inc., was formed to purchase films and rent or resell them to the theaters petitioner operated. The following is a summary of the corporations wholly owned by petitioner and the theaters each corporation operated at some time between 1974 and 1978. Gayety Theaters, Inc. (Gayety), a subchapter S corporation, operated the Gayety Burlesque Theater, the Pussycat Theater and the Kittycat Theater all located in Miami, Fla. Ell Gee, Inc. (Ell Gee), a subchapter S corporation, operated the Roxy Theater in Miami Beach, Fla., the Luv Theater in Orlando, Fla. and the Navy Point Theater in Pensacola, Fla. Paris Follies, Inc. (Paris Follies), a subchapter S corporation, operated the Paris Follies Theater in Miami Beach, Fla., the Pussycat Theater (a/k/a Sinerama) in New Orleans, La. and the Capital Theater in Chattanooga, Tenn. L. C. Griffith Productions, Inc. (L. C. Griffith), *480 a subchapter S corporation, operated the Ritz Theater in Miami, Fla. Griffco, Inc., a subchapter S corporation, operated the Paramount Theater in Miami, Fla., the New Carrolton Theater in New Orleans, La., the Cameo Theater in Miami Beach, Fla. [8] and the Climax I and II in North Carolina. Carib Theater Productions, Inc., a subchapter S corporation, operated the Carib Theater in Miami, Fla. Adam & Eve Theaters, Inc., a C corporation, operated a theater of the same name in Ft. Lauderdale, Fla.
GTI Productions, Inc., a C corporation, organized to purchase films and rent them or sell them to petitioner's other corporations filed its last corporate income tax return on March 31, 1975. GTI Productions, Inc. filed no Federal income tax return for any subsequent fiscal years. On December 1, 1977, the State of Florida canceled GTI's corporate charter for "nonpayment of the 1977 *481 annual report." Petitioner had a few key employees who helped him run this enormous business. Harriet Miltenberg was petitioner's secretary during most of the years in question. She wrote out checks for the daily expenses of each of the theaters and petitioner signed them. Otherwise, she wrote checks only at the direction of petitioner and his accountant, Richard Reisenberg. Only petitioner had signatory authority. George Luther was petitioner's "number two" man. When petitioner was not available Luther was the boss. He hired and fired people, placed advertisements, booked dates and wrote out checks, although only petitioner had signatory authority. Petitioner made the final decision on live acts and certain film purchases. Luther did a great deal of film purchasing for petitioner. Every two or three months he would purchase 15-30 films at a cost of approximately $ 500-$ 1,500 apiece. The payments were usually made 50 percent in cash and 50 percent by check. Lou Hollander was a theater manager. He had other responsibilities too. Either Mr. Hollander or Ms. Miltenberg would collect the box office receipts every weekday morning. The receipts were brought back to *482 the main office and entered on deposit slips. Not all of petitioner's theaters operated at the same point in time. Often petitioner's theaters would stay open for a few months and then close. There were several business reasons to maintain this type of corporate structure in the adult entertainment business. The obscenity laws take into account the mores of the local community. Petitioner's corporate structure prevented all of his theaters from being shut down if there was an isolated violation of an obscenity law. Furthermore, since petitioner's theaters opened and closed frequently, the multi-corporate structure prevented all of petitioner's operations from being liable for the expenses and lease liabilities of a theater which went out of business. Each of the corporations maintained separate books and records. Each corporation also maintained separate checking accounts. Despite the appearance of independence, however, there were a multitude of intercorporate financial transactions as well as numerous financial transactions between the corporations and petitioner, their sole shareholder. An idiosyncrasy of the adult entertainment business is that many of the transactions *483 occur after business hours and many are conducted strictly in cash. Petitioner often paid movie distributors and entertainers with cash. There were three main reasons for this. First, both the entertainers and the distributors traveled and they needed cash to meet their expenses. Second, knowing the risky, and often temporary nature of the adult entertainment business, film distributors would not always be willing to accept a check which might be returned for insufficient funds. Third, the film distributors were reluctant to accept checks in order to avoid the creation of a paper trail which could possibly be used against them if charged with a violation of pornography laws. The problems associated with using cash were amplified in petitioner's business. If one of petitioner's checks bounced, rather than deposit cash to cover the check, petitioner would most often pay the check outright in cash. This caused bookkeeping problems because many times the check was lost and there was no record of which bills were paid. This meant relying on memory to account for many business expenses. Another common practice connected with the use of cash in the operation of petitioner's *484 business was that petitioner would cash checks in order to pay expenses. Therefore, rather than making the check payable to the creditor, petitioner would make the check payable to himself, an employee or to cash. The check was then either cashed at a bank or by a petty cash fund of one of petitioner's corporations. Then petitioner paid the creditor in cash. Obviously, the use of this method for paying bills added to the disallowance of numerous deductions for lack of substantiation, and to the general confusion in these cases. The disarray of the corporate books also affected petitioner's personal finances. The reason for this is two-fold. First, petitioner maintained open loan accounts with all of the corporations. Second, petitioner was the sole shareholder of six subchapter S corporations and, as such, the corporations' taxable income or net operating losses flowed through to him as an individual. Section 1373 and 1374. Petitioner used the open loan accounts as a method both for infusing a corporation with capital and a method of withdrawing cash from his corporations. None of the loan transactions between petitioner and the corporations were evidenced by promissory *485 notes or repayment schedules. Between 1974 and 1975 petitioner withdrew almost $ 130,000 in shareholder loans from his corporations and through 1978 he withdrew a total of over $ 2,000,000 from his corporations. During this same period petitioner declared only $ 35,000 in taxable income from the same corporations. [9] (See Appendix C) Petitioner also advanced several hundred thousand dollars in loans to the corporations. [10]
*486 Petitioner also borrowed money from other sources. At times he borrowed money from his long-time associates Oscar Markovich, William Berger or Joseph Savino. In total he probably borrowed several thousand dollars. Most of the time the money was borrowed either to go into another venture or to start another theater. The interdependence between personal and business funds was even further entwined. In the early 1970's petitioner was involved in the production of a movie entitled "My Third Wife, George." [11] In connection with the movie, petitioner opened a bank account to cover expenses and to collect profits. "My Third Wife, George" was never part of any of petitioner's existing corporations, nor did it ever file any tax returns. The record is unclear as to whether any profits were ever made by the film. Thus, it is also unclear whether any profits were or should be included in petitioner's income. The "My Third Wife, George" account became the personal checking account of petitioner. Between August 29, 1975 and August 31, 1976 alone, *487 $ 143,150 was deposited into this account and $ 142,800 was expended from it. Petitioner had a reputation as a card player. He played cards with William Berger, Joe Savino and Hyman Lazar. He also had a reputation as a gambler. Petitioner traveled to the Bahamas and Las Vegas on several occasions. In fact petitioner paid as much as $ 42,500 to seven different casinos out of the "My Third Wife, George" account between August 29, 1975 and August 31, 1976. The checks paid off petitioner's outstanding lines of credit at the casinos. During the years in question, petitioner was living at 4460 Bay Point Rd., Miami, Fla. This was a fairly affluent section of Miami. Petitioner, who was single, lived in the home with his girlfriend Linda Rivera and three of his children, Kimberly, Cash and Sean. Gayety, one of petitioner's S corporations, owned the home. At the time petitioner was living at Bay Point Rd., petitioner's sister, Margaret Jenkins, and her five children were living rent free at 539 Euclid Ave., an apartment building owned by another of petitioner's corporations. Floyd and Shirley Griffith, petitioner's father and stepmother, were also living at 539 Euclid Ave. *488 Petitioner is the father of four children, Kimberly, Cash, Sean and Charles. He has been married at least once to Monique (Juanita) Lauderville, who worked for petitioner for a short time and is the mother of Kimberly. Joy Griffith Maci is the mother of two of petitioner's other children and Maryanne Tobin is the mother of petitioner's fourth child. Maryanne Tobin also occasionally worked for petitioner in some capacity. Petitioner's father Floyd and his stepmother Shirley also worked for him. Floyd Griffith was a handyman at all of the local theaters and Shirley helped Floyd as well as filling in elsewhere as needed. OPINION Consents to Extend the Statutory Period for Assessment and Collection of Tax
Petitioner executed two powers of attorney on behalf of himself individually, in favor of Richard Reisenberg, his accountant, for the 1970 through 1976 taxable years on February 22, 1977; and on June 15, 1979 for the 1970 through 1977 taxable years. Petitioner utilized respondent's Form 2848 to grant these powers of attorney. The preprinted form provides five specific powers that are granted by signing the Form 2848. The taxpayer is advised to strike through any *489 of the five powers which are not granted. One of the enumerated powers is the authority "to execute consents extending the statutory period for assessment or collection of taxes." Petitioner did not strike through any of the enumerated powers and thus granted Reisenberg an unlimited power of attorney. Reisenberg is neither a certified public accountant nor an enrolled agent before the Internal Revenue Service. Side two of Form 2848 requires the signature of the person(s) receiving the power of attorney. If the person is an attorney, certified public accountant or an enrolled agent they must attest that they are not currently suspended or disbarred from practice and state their designation. A person who does not fall into one of the three enumerated categories must have his or her signature witnessed and notarized. Richard Reisenberg signed the first form under the designation of accountant on February 23, 1977. Two persons signed the witness portion of side two of the form on February 22, 1977, the date it was signed by petitioner. Reisenberg signed the second form under the designation of accountant on June 15, 1979 and two persons signed as witnesses on that date. Neither *490 form was notarized. This raises the question of the validity of the powers of attorney. Petitioner unquestionably granted Reisenberg a power of attorney on side one of Form 2848. Reisenberg unquestionably signed the form in acceptance of the power. Moreover, petitioner does not argue that the power of attorney is invalid because the Form 2848 was not properly witnesses or notarized. Therefore, we need not decide this issue. Petitioner's contention is that the consent to extend the statute of limitations, Form 872, was invalid for reasons hereinafter discussed. There were a total of four consents to extend the statutory period (Forms 872) for the 1974 taxable year and three such consents for the 1975 taxable year. The first consent to extend the statutory period for the 1974 taxable year was signed by Richard Reisenberg, under the power of attorney, on March 29, 1978. The form extended the time for assessment of tax for the 1974 taxable year until December 31, 1978. The second consent for the 1974 taxable year and first consent for the 1975 taxable year were signed by Leroy Griffith on November 2, 1978 and extended the statutory periods to June 30, 1979. Richard *491 Reisenberg subsequently signed to additional consents for the 1974 and 1975 taxable years under a power of attorney. These consents, signed on June 5, 1979 and November 2, 1979, extended the period of assessment, first through December 31, 1979, and ultimately through December 31, 1980. The statutory notice was mailed to petitioner on September 19, 1980. In his pleadings petitioner alleged that the statutory notice of deficiency as to 1974 and 1975 was invalid because it was barred by the statute of limitations. Respondent generally has three years to assess taxes. Sec. 6501(a). The statute of limitations can be suspended if the taxpayer agrees with the Secretary in writing, before the running of the statute, to extend the statutory period. Sec. 6501(c). In this case petitioner claims that the statute of limitations bars the assessment and collection of tax for 1974 and 1975 because the consents extending the time period were invalid. The party claiming the defense of a running of the statute of limitations has the burden of raising it in his pleadings. To meet his initial burden *492 the party must present evidence that proves the notice of deficiency was issued more than three years after the taxpayer filed his return. After the party successfully establishes this prima facie case, the opposing party must then go forward and present evidence that one of the four above enumerated exceptions exists. If the opposing party can do this the burden of going forward shifts back to the party claiming the defense to prove the alleged exception is invalid or inapplicable. Adler v. Commissioner,85 T.C. 535, 540 (1985). Here petitioner presented a prima facie case that the notice of deficiency was untimely. Petitioner filed his 1974 tax return on June 13, 1975 and his 1975 tax return on April 27, 1976. The statutory notice of deficiency was issued on September 19, 1980, more than three years after the returns were filed. Respondent has shown that consents were signed "Richard Reisenberg, Power of Attorney," extending the statutory period until December 31, 1980; and that the statutory notice of deficiency was mailed within the time of the last consent extending the period for assessment and collection of tax. Petitioner argues that the consents *493 are invalid "on their face" and therefore respondent retains the burden of proving the validity of the consents. We disagree. It is not apparent from the face of the consent, [12] as opposed to the Form 2848, that Reisenberg is authorized to extend that period for the assessment and collection of tax under respondent's regulations. Rather, this fact can only be discerned by reference to other documents in conjunction with the consent. Respondent has presented evidence, discussed below, that an exception to the statute of limitations exists and therefore, the burden of going forward shifts back to petitioner who must prove the consents extending the statutory period were invalid. *494 Petitioner argues that the consents signed by Richard Reisenberg are invalid because under respondent's own regulations a person who is not an attorney, certified public accountant or an enrolled agent is not authorized to sign a consent extending the period for assessment and collection of taxes, and that respondent's agent knew that petitioner's accountant was not a certified public accountant or an enrolled agent. [13] Furthermore, petitioner argues that respondent's agent misled petitioner and Reisenberg into signing the consents because he informed Reisenberg in writing that failure to sign would result in a notice of deficiency being issued and a loss of all of petitioner's appeal rights within the Internal Revenue Service. Finally, petitioner argues that Reisenberg lacked the actual authority to sign the consents to extend the period for assessment and collection of tax, because he did not seek and receive petitioner's permission before signing. Respondent answers that the regulations issued by the Treasury Department *495 are directory rather than mandatory, and so the fact that Reisenberg is not an attorney, certified public accountant or enrolled agent does not automatically invalidate the consents. Further, petitioner specifically granted Reisenberg the power to execute the consents at issue by giving him an unlimited power of attorney. Finally, even if Reisenberg did not have the actual authority to execute the consents, petitioner should be equitably estopped from claiming Reisenberg lacked authority. We note parenthetically the both parties use the term "regulation" in referring to Circular 230, 31 C.F.R., Part 10, 1966-2 C.B. 1171, which, as noted, appears in the Code of Federal Regulations. For purposes of this discussion we adopt their terminology. Circular 230, issued by the Treasury Department in 1966, sets forth the revised rules of practice before the Internal Revenue Service for the years in issue. Section 10.7 provides that persons who are not attorneys, certified public accountants or enrolled agents may practice before the Service in a limited manner. Section 10.7(a)(7), the applicable provision to this case, specifically provides: (7) Any person, who is not *496 under disbarment or suspension from practice before the Internal Revenue Service or from practice of his profession by any other authority (in the case of attorneys, certified public accountants, and public accountants) and who signs a return as having prepared it for the taxpayer, or who prepared a return with respect to which the instructions or regulations do not require that it be signed by the person who prepared the return for the taxpayer, may appear without enrollment as the taxpayer's representative, with or without the taxpayer, before revenue agents and examining officers of the Audit Division in the offices of District Directors (but not at the district conference in a District Director's office) with respect to the tax liability of the taxpayer for the taxable year or period covered by that return. Proper authorization from the taxpayer will be required. All such persons will be subject to such rules regarding standards of conduct, the extent of their authority, and other matters as the Commission of Internal Revenue shall prescribe. Such persons will be permitted to represent taxpayers within those limits without enrollment, except that the Commissioner may deny *497 permission to engage in such limited practice to any person who has engaged in conduct which would justify suspension or disbarment of any attorney, certified public accountant, or enrolled agent under the provisions of this part. [1966-2 C.B. 1177-1178. Emphasis added.] Pursuant to this provision, respondent issued Revenue Procedure 68-20, 1968-1 C.B. 812. Section four of the Procedure specifies the limitations on the practice privilege for those who are not enrolled to practice before the Service. Section four, Subpart .02(c), specifically states that executing consents to extend the statutory period for assessment or collection of tax is beyond the scope of authority of an unenrolled preparer.
Both petitioner and respondent focus their arguments on the regulation and what it "requires" respondent to do. But the regulation has not been violated by either party. The only limitation actually specified in the regulation is that unenrolled preparers may not appear at the district conference in a District Director's office. That did not occur in this case. The real question, instead, is "who violated the revenue procedure promulgated *498 pursuant to Circular 230, and what consequences flow from that violation?" Here, Reisenberg, an unenrolled preparer, signed a consent. Under the revenue ruling, this act was beyond the scope of his authority. Even though respondent erroneously accepted the consent, it is petitioner's accountant, armed with an unlimited power of attorney, who violated the revenue procedure. The revenue procedure does not require respondent to do anything. It requires the taxpayer to do something, i.e., to be represented by a person with certain credentials. The fact that respondent's agent knew Reisenberg was not an enrolled agent does not change the result. The revenue procedure is directory, not mandatory. Respondent would have been justified in refusing to accept the consents signed by Reisenberg. The converse is not true. Petitioner cannot ignore the revenue procedure by allowing his accountant to sign the consents and then claim the consents are invalid because respondent accepted them. The bottom line is that respondent did not take any action contrary to either the regulation or the revenue procedure. Petitioner's duty of consistency mandates that he be bound by the consequences *499 of his own actions. See, e.g., Arkansas Best Corp. v. Commissioner,83 T.C. 640, 659 (1984), affd. in part, revd. in part 800 F.2d 215 (8th Cir. 1986), affd.   U.S.    (March 7, 1988); Southern Pacific Transportation Co. v. Commissioner,75 T.C. 497, 838-839 (1980). We find that the consents are valid. This brings petitioner's next argument -- namely that he and Reisenberg were misled into signing the waivers and as a result, they are invalid. In essence petitioner is claiming the waiver was signed either under mistake or duress. In either event, we do not agree that respondent's actions invalidate the waivers. Agent Crane informed Reisenberg in two separate letters that failure to extend the statute of limitations would force Crane to issue a statutory notice of deficiency based upon the information from the audit, and that petitioner's appeal rights within the Revenue Service would be lost. This statement was only partially true. Typically, when a case is docketed in this Court and it has not yet been through the Appeals Office, respondent sends the case to Appeals for a taxpayer's conference before it is sent to district *500 counsel. See sections 601.105 and 601.106, Statement of Procedural Rules. Although petitioner would not typically forfeit his rights to an Appeals Conference, after a petition is filed in this Court a case may not be settled administratively. The Court must agree with the settlement and enter the decision. Moreover, to protect the statute of limitations respondent could lawfully issue a deficiency notice if petitioner refused to extend the statute. Threatening lawful action, even if contrary to stated policy, is not duress. Burnet v. Chicago Ry. Equipment Co.,282 U.S. 295 (1931). There is nothing in either the Constitution or the Internal Revenue Code which requires appellate review within the Internal Revenue Service. The lack of appellate review, without at least a showing of harm from the denial of the appellate review, is not a violation of due process. See Rosenberg v. Commissioner,450 F.2d 529, 533 (1971). (Taxpayer received a hearing de novo in the Tax Court and failed to show what would have been gained by a conference with the Appellate *501 Division.) Thus respondent could have lawfully carried out precisely what Crane "threatened." Petitioner's claim of duress or mistake must fail. Finally, we address petitioner's argument that Reisenberg lacked actual authority to sign the consents. Petitioner claims that Reisenberg signed the last two consents that extended the statutory period without petitioner's approval. The fact is, however, that petitioner executed an unlimited power of attorney in favor of Reisenberg in February 22, 1977. This gave Reisenberg actual authority to act on petitioner's behalf. See 1 Restatement, Agency 2d, sec. 26 (1958). That power of attorney was delivered to and accepted by respondent. This created an apparent authority in Reisenberg to act on petitioner's behalf. See 1 Restatement, Agency 2d, sec. 27 (1958). Whatever the actual arrangement between Reisenberg and petitioner, there was never any indication made to respondent that Reisenberg's authority to act on petitioner's behalf was limited. [14] The fact that petitioner now claims that he never intended to have Reisenberg sign the consents is not controlling. Petitioner is bound by and liable for the acts of his agent until *502 such time as his apparent authority was effectively terminated. Thus, we cannot find the consents invalid for lack of authority since petitioner has not shown that Reisenberg's authority was effectively terminated. The consents are valid. Substantive Issues
We now address the substantive issues in this case. As a preliminary matter, respondent's determination in the notice of deficiency is presumed correct and petitioner has the burden *503 of proving either his entitlement to any deductions or any erroneous inclusions in income. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). This is true in this case, even though the reasons for respondent's adjustments are not specified in any greater detail than is depicted in the chart at Appendix A. As a result of the lack of precision, we are able only to consider on redetermination those specific items raised by petitioner.[15] Any item or amount of the deficiency not addressed by petitioner is deemed to be conceded and found in respondent's favor. (1) Substantiation of Deductions
(a) Film Expenses
The first substantive issue we address is petitioner's substantiation of film expenses. Petitioner has the burden of proving entitlement to those film expenses disallowed by respondent and those film expenses he now claims he failed to deduct or miscategorized as travel and entertainment expenses. Rule 142(a); Welch v. Helvering, supra.In 1974 petitioner claimed $ 159,149 in film expenses. Respondent *504 allowed $ 127,299. During 1974 petitioner operated seven theaters for the entire taxable year and one theater for approximately six months. In 1975 petitioner claimed $ 197,014 in film expenses for the operation of ten theaters for the entire taxable year. Respondent allowed $ 64,114. In 1976 petitioner claimed $ 152,464 in film expenses for the operation of twelve theaters. Respondent allowed only $ 3,064. In 1977 petitioner claimed $ 39,364 in film expenses for the operation of six theaters. Respondent allowed $ 16,589. Finally, in 1978 petitioner claimed $ 24,553 in film expenses for the operation of five theaters, and respondent allowed $ 3,886. The deductions respondent disallowed were payments in 1974 and 1975 to "My Third Wife, George"; payments in 1975, 1976 and 1977 to GTI [16] and payments to "cash" during all the years in question. *505 Petitioner contends that the payments to "My Third Wife, George" and to "cash" represent cash expenditures for films. Petitioner further asserts that his business purchased a large portion of its films for cash. Cash payments were used because of the Supreme Court's decision in Miller v. California,413 U.S. 15 (1973), which defined pornography in terms of local community standards. This resulted in concern over creating a paper trail which could be used in either civil or criminal prosecutions.[17]
Petitioner further asserts that payments to GTI were legitimate film rental expenses. GTI was incorporated for the stated purpose of purchasing films and then renting them to petitioner's theaters. In addition to the disallowed deductions, petitioner alleges he is entitled to deduct cash expenditures for films and other items which he previously miscategorized as travel and entertainment expenses. In support of the previously unclaimed expenses petitioner directs us to an exhibit containing several canceled checks. Petitioner argues that the checks written to round numbers *506 such as $ 1,500 or $ 5,500 were really cash expenditures for films. All of these "missed deductions" were in 1977. Petitioner also claims that in 1974 five of his corporations paid $ 21,000 to Sol Abrams as film expenses but that the deduction was erroneously shown on returns of travel and entertainment expenses. Finally, petitioner suggests an alternative approach to deal with all the film deductions. Petitioner suggests that rather than look at particular items, we could look to 1974 and 1975 when respondent allowed petitioner to deduct an average film expense of $ 20,000 per theater. Using this as a guide we should allow $ 20,000 for each theater in operating during each of the five tax years in question. Petitioner contends that even though this results in his losing the benefit of cash expenditures made during 1974 and 1975 because he would not be entitled to any additional previously unclaimed film expenses, it provides a fair and easy way to estimate expenses. We begin by examining whether petitioner is entitled to the deductions he actually claimed. First, petitioner has not convinced us that the "My Third Wife, George" account ever actually was used for film rentals *507 to his corporations. Therefore, those deductions taken in 1974 and 1975 for payments to "My Third Wife, George" were properly disallowed. Second, payments to cash could have been for anything. The testimony at trial did not convince us that these particular checks were for film expenses. Therefore checks payable to cash were also properly disallowed. Third, petitioner has failed to convince us that GTI continued in existence after March 31, 1975. Conspicuously missing from evidence are canceled checks from GTI to film vendors after March 31, 1975. There is no question that petitioner purchased hundreds of films and that the films were then rented to the separate corporations. Respondent was correct in disallowing deductions for payments to GTI after March 31, 1975. It is not our intention to totally disregard reality. From the evidence presented at trial we know the following facts: (1) petitioner showed films in his theaters; (2) petitioner, through his corporations, operated one theater for six months in 1974 and seven theaters for all of 1974, ten theaters during 1975, 12 theaters during 1976, six theaters during 1977 and five theaters during 1978; (3) films were shown *508 at one theater and then transported to and shown at another of petitioner's theaters; (4) petitioner typically ran two shows in each theater; and (5) petitioner paid between $ 500 and $ 1,500 for each adult film. Several witnesses testified that petitioner's practice was to have two different films in each theater and to not repeat the same film at any one theater during the year. Using our best judgment, and bearing heavily against petitioner for his lack of records ( Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930)), we find petitioner purchased or rented 104 films per year. Finding each film to cost $ 500, petitioner, through his corporations, expended at least $ 52,000 per year on films ($ 500 x 104 films). [18]
In summary, after taking account of the film expenses respondent has allowed, petitioner's corporations are not entitled to any additional film expense deductions *509 for 1974 or 1975. Petitioner's corporations are entitled to additional deductions of $ 48,936, $ 35,411 and $ 48,114, respectively for the 1976, 1977 and 1978 taxable years. Moreover, using the amounts claimed on the corporate returns as a guide, the following percentages of the increased allowable deductions are allocated to various corporations: 1976
1977
1978
Gayety
34.4
16.0
70.0
Griffco
15.6
Paris Follies
36.4
10.5
20.0
L. C. Griffith
9.1
6.0
8.0
Ell Gee
4.6
3.5
2.0
Carib
64.0
(b) Finder's Fee
On August 30, 1961, Ninth Street Amusement Company, Inc. (Ninth Street) entered into a lease with Stanley Company of America, Inc. (Stanley) as lessor. The lease was for a burlesque theater located in Washington, D.C. Oscar Markovich operated the concessions at the burlesque theater. Petitioner was always interested in starting new theaters. On November 4, 1963 petitioner sent a letter to Ella Davis, Oscar Markovich's girlfriend. The letter referred to the assumption of the lease existing between Ninth Street and Stanley and provided: This letter will confirm that you are arranging for the undersigned to assume the lease presently *510 existing between Stanley Company of America, Inc., as lessee, and the 9th Street Amusement Company, Inc. as lessor. In view of your bringing this deal to my attention and indicating that the operation will be financially beneficial, and further considering your assignment to be entered into, I feel that you are entitled to a finder's fee. Therefore, if the assignment is entered into and I assume the above lease, and if I operate under the said lease for the full term and duration, and if the said operation is financially successful as you indicated, I will pay to you at the expiration of the said lease the sum of $ 50,000.00 as a finder's fee. Between 1968 and 1971 several payments were made to Ella Davis. On June 12, 1972 Leroy Griffith executed a mortgage deed on Gayety Theater to Davis securing a $ 50,000 promissory note, without interest, whereby Davis was to be paid $ 200 per week until paid in full. Payments began in July 1972. During the years which are before the Court, petitioner, through Gayety, paid Davis $ 10,400 in 1974, 1975 and 1976, and an additional $ 4,200 in 1977. In 1978 Davis was paid $ 5,200 recorded via an adjusting journal entry on Gayety's books. *511 Petitioner argues that he had a personal obligation to pay Davis $ 50,000 for the assignment of the lease and that Gayety only entered the transaction to provide security. Petitioner also argues that he is entitled to the ordinary deduction for the finder's fee payment because he was engaged in the business of operating theaters and that the payments were related to his business. Finally, petitioner asserts the payments were deductible whether claimed on Gayety's corporate tax return or petitioner's individual tax return. Respondent argues that the payments to Davis are not deductible. Respondent relies on two arguments in making this determination. First, petitioner has failed to prove the $ 50,000 payment was an ordinary and necessary business expense within the meaning of section 162. Second, the transaction was a sham. The agreement between petitioner and Davis provided that part of her consideration for the $ 50,000 was an "assignment to be entered into." There is no evidence in the record indicating to what this statement refers. Respondent argues that since petitioner presented no evidence of the "assignment" he has no shown that Davis fulfilled her obligation and *512 he has not met his burden of proof as to the deductibility of the payments. Further, respondent asserts the agreement was a sham because although petitioner purports to paying a "finder's fee" to Davis, he fails to mention that he was president of Ninth Street at the time of the assignment. Thus, it is apparent petitioner both knew of the lease and owned the lease before the assignment for which Davis was paid. The evidence supports respondent's claim. The facts clearly indicate that Ella Davis was not paid a fee for "finding" the theater in Washington, D.C. Petitioner has not presented any additional evidence which would justify payments of $ 50,000 to Davis either as his own business expense or as a business expense of Gayety. Therefore, petitioner is not entitled to a deduction under section 162. (c) Auto Expenses
Petitioner used two automobiles in his businesses. He traveled between the theaters on a regular basis to monitor their operations. Certain of petitioner's employees also used petitioner's automobiles to pick up entertainers at the airport and to drop films off at other theaters and the bus terminal. Petitioner and Linda Rivera also used the two *513 automobiles for their personal needs. Between 1974 and 1977 L. C. Griffith, Ell Gee and Gayety all claimed deduction for auto expenses. Respondent conceded a depreciation deduction in the amount of $ 2,292 for Gayety in 1974 through 1976, inclusive. Gayety did not claim any additional auto expenses. Petitioner claims that Ell Gee and L. C. Griffith are entitled to the following additional deductions as reported on the corporate returns which respondent disallowed. 1974 1975 1976
1977
Ell Gee
auto & truck expenses
$ 640   $ 1,629
$ 1,320
$ 670
depreciation
1,801   2,202
insurance
592.50
1,290
833
L. C. Griffith
repairs
114
In addition, since petitioner's corporations failed to claim depreciation and actual expenses on two cars for all the years before the Court, petitioner claims the corporations are entitled to previously unclaimed deductions. [19]
Petitioner presented no evidence at trial concerning either *514 petitioner's, nor any of the corporate's, bases in the two automobiles. He also failed to present any evidence concerning when the vehicles were put in service and when they were taken out of service. Respondent has conceded that Gayety is entitled to depreciation on one vehicle in 1974, 1975 and 1976. There is no evidence which indicates Gayety is entitled to depreciation in 1977 or 1978. Similarly, since petitioner failed to prove Ell Gee had any basis in the second automobile and failed to prove when it was in service, we have no reason to allow Ell Gee to depreciate an automobile. Petitioner also contends Ell Gee is entitled to the auto expenses it claimed on its return. These include general expenses and insurance. Petitioner failed to present any evidence such as canceled checks, the policy itself, or testimony of an insurance company employee to substantiate insurance expenses. Petitioner's failure to produce this evidence leads us to conclude that this type of evidence would not have supported petitioner's claim. Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165, (1946), affd. 162 F.2d 153 (10th Cir. 1947). Likewise, *515 petitioner failed to present any evidence to substantiate the general automobile expenses. He failed to maintain any type of mileage log which would have entitled him to use the optional method for computing automobile expenses. Therefore, Ell Gee is not entitled to either the general auto expenses or the insured expense. [20]
Petitioner did not submit any evidence substantiating the $ 114 repair expense taken by L. C. Griffith. We do not know to which vehicle the alleged repair was made or that the repair was an ordinary and necessary business expense. Therefore, we cannot allow L. C. Griffith's repair deduction. (d) Contract/Casual Labor
After concessions by respondent the following deductions remain in dispute: 1974
1976
1977
Griffco
$  50
$   650
Ell Gee
100
2,500
$ 800
Carib
100
All of these deductions *516 were for payments made to Floyd and Shirley Griffith. There was a great deal of testimony at trial substantiating contributions made both by Floyd and Shirley Griffith to petitioner's operation. In fact, respondent has conceded the portion of the claimed contract/casual labor payments made to Floyd and Shirley Griffith attributable to Gayety. The evidence presented at trial convinced us that Floyd and Shirley Griffith provided services to many of petitioner's theaters located in the Miami area. The above three corporations all operated theaters in and around Miami and we believe that Floyd and Shirley Griffith provided services to the above-mentioned additional labor expenses under section 162. (e) Miscellaneous Itemized Deductions
There are two miscellaneous itemized deductions at issue. Petitioner claims he is entitled to an $ 8,500 deduction in 1974 and a $ 2,700 deduction in 1977. In 1974 petitioner attempted to get a loan of $ 640,000. In connection with this loan, which he never received, he claims he paid the person who brought the deal to his attention $ 8,500. Of this amount, $ 3,500 was in the form of a cashier's check and $ 5,000 was in cash. Petitioner *517 never got his money back even though the loan was not made. In support of this deduction petitioner introduced the customer copy of the $ 3,500 cashier's check. He also submitted an unsigned agreement that calls for a nonrefundable $ 3,500 application fee which is applied towards costs if the loan is approved. Petitioner failed to produce any evidence of a business purpose for the loan. Absent such a showing, even if petitioner actually paid the money, he is not entitled to this deduction under section 162. Petitioner claims the $ 2,700 payment in 1977 was to Manuel Uriate and was the cost to produce "Cabaret" with a female impersonator at the Roxy Theater and the Carib Theater. To substantiate his entitlement to this deduction petitioner submitted an unsigned, uncashed check payable to Manuel Uriate drawn on the "My Third Wife, George" bank account. The notation on the check reads "For Cabaret Cast Roxy 3/29-4/3." Also, across the check it reads "paid by cash." This evidence combined with petitioner's testimony convinces us that $ 2,700 was paid for this production. Under normal circumstances this evidence would be insufficient, but several witnesses at trial corroborated *518 petitioner's practice of writing unsigned checks to use as receipts for cash payment. Therefore, petitioner is entitled to a $ 2,700 miscellaneous deduction in 1977. (2) Previously Unclaimed Deductions
According to petitioner there are five general categories of previously unclaimed deductions still at issue (in addition to the previously unclaimed auto expenses discussed above). These categories are set out separately below. (a) Additional Rent Deductions for Paris Follies' Pussycat Theater (New Orleans) for 1976, 1977 and 1978
Paris Follies operated the Pussycat Theater in New Orleans, La. during 1976, 1977 and 1978. Petitioner claims Paris Follies is entitled to accrue $ 75,000 for rent expenses on the Pussycat Theater for 1976 and 1977; and $ 73,350 for 1978. On its corporate return Paris Follies deducted the following amounts, which respondent allowed in full: 1976
$ 51,499
1977
25,802
1978
71,550
Thus, the amounts in issue are $ 23,501 for 1976, $ 49,198 for 1977 and $ 1,800 for 1978. In support of his assertion petitioner submitted an unsigned copy of a lease agreement between Trans-Lux, a New Orleans corporation as lessor and *519 BGNO (which stood for Berger Griffith New Orleans), a New Orleans corporation, as lessee. According to petitioner Paris Follies assumed the lease which existed between Trans-Lux and BGNO; the lease required $ 75,000 in annual rent in 1976 and 1977; and the rent was reduced in 1978 from $ 75,000 to $ 54,600 in consideration of forfeiture of the $ 18,750 security deposit Paris Follies paid on the lease. The document which petitioner submitted is an unsigned copy of a lease. We do not consider this document to be evidence of a final agreement between Trans-Lux and BGNO, the apparent original parties to the lease. Even if we did accept the lease as the final agreement between the parties, under the terms of the lease the lessee must get written consent to assign the lease. Thus while petitioner claims Paris Follies assumed the lease, he has failed to introduce the documentary evidence to support his position. The lease in evidence extends for six months, from May 16, 1975 to November 15, 1975. According to the terms of the document the lessee was required to give written notice of its intent to renew the lease. Petitioner has not submitted any evidence which indicates that Paris *520 Follies or BGNO renewed the lease. In sum, we have not received any evidence which proves Trans-Lux actually entered into a lease agreement with BGNO or that Paris Follies assumed the lease liabilities of $ 75,000 annual rent of BGNO. The parties have stipulated that Paris Follies operated the Pussycat Theater in New Orleans. We do not doubt that fact. We do, however, doubt that Paris Follies was legally liable for $ 75,000 rent in 1976 and 1977 or $ 73,350 rent in 1978. Therefore, we see no reason to allow Paris Follies to deduct rent expenses beyond those it originally claimed and which respondent originally allowed. (b) Additional Deductions for Payments Made With Regard to the Liberty Bank and Trust Company Account
Petitioner and Donald James, one of petitioner's employees, had a bank account at Liberty Bank and Trust Co. in New Orleans, La. Petitioner claims he is now entitled to the following deductions in 1977 for payments made from the Liberty Bank account to pay expenses for the Pussycat Theater in New Orleans: Film Rental
$   500.00
Rent
5,000.00
Travel and Entertainment
650.00
Legal
1,220.00
Taxes
305.00
Utilities
547.85
*521 In addition petitioner claims he is entitled to the following additional deductions for payments ultimately paid in cash, but which were represented by uncashed checks from the same account: Film Rental
$   400.00
Salary
1,681.83
Petty Cash
44.41
Petitioner has the burden of proving his entitlement to these deductions. Rule 142(a). He has failed to do this. Petitioner has simply placed copies of the checks into evidence. He has not shown a business purpose for the payments, nor has he shown that the items, if deductible, were not previously deducted in 1977 by Paris Follies, the corporation which operated the theater. Petitioner's testimony without more, does not convince us that he is entitled to deduct any of these additional amounts. (c) Additional Deductions for Legal Fees.
In 1976 petitioner paid $ 9,000 in legal fees to Mr. Silvers, an attorney in New Orleans. Respondent has conceded that $ 4,000 of this amount is deductible. Respondent has also conceded that the total amounts claimed for 1975 and 1977 are deductible. Petitioner lived in Florida and it is likely that any personal matters requiring legal advice would arise in Florida. We *522 find that the payments to Mr. Silvers in New Orleans were business related. Moreover, we see no reason why respondent would have conceded the other amounts but not this $ 5,000. Respondent has not suggested any reason why this $ 5,000 was not treated like the other amounts paid to Silvers. Therefore, petitioner is entitled to a $ 5,000 deduction for legal fees in addition to the amounts conceded by respondent. (d) Additional Checks Disbursed From Intercontinental Bank
Petitioner claims he is entitled to the following previously unclaimed deductions in 1977 for expenses paid out of checking account no. XXXX-XX5-502 at the Intercontinental Bank of Miami Beach: Advertising
$ 21,651.33
Taxes
4,489.45
Legal and Accounting
2,462.54
Utilities
1,124.49
Salary
500.00
Film Purchases
1,500.00
Repairs & Maintenance
200.00
Mr. Silverman, an accountant hired to assist in the trial of this case, testified that the Intercontinental account was for Griffco. Griffco went out of business in 1976. Therefore, amounts paid from the account were not deducted in 1977 by Griffco. At trial petitioner submitted copies of the checks at issue. There is no indication *523 on the face of the checks that they were issued from a Griffco account. Other checks in evidence drawn in 1978 from the same account have "Griffco, Inc." imprinted on the face of those checks. We find, however, that the 1977 checks were in fact written from the Griffco account, and, since no returns were filed for Griffco after 1976, none of the allowable deductions were previously taken. Petitioner used funds left in the Griffco account to pay expenses of other theaters. The types of expenses incurred are business expenses. We thus find petitioner has substantiated the following additional deductions in 1977: Advertising
Miami Herald
20,997.57
All Night Show
150.00
Showcase
405.00
The Weekly
100.00
Total
$ 21,651.57
Taxes
Internal Revenue Service
953.24
Fla. Dept. of Revenue
2,277.48
La. Dept. of Revenue
581.15
Total
$ 3,811.87
Legal and Accounting
Mincberg, Atty.
1,400.00
Reisenberg, Accountant
312.54
Total
$ 1,712.54
Petitioner has failed to prove his entitlement to any additional deductions. Checks he claims were for taxes were made out to the City of New Orleans. There is *524 not a clear enough indication, even combined with petitioner's testimony, that those checks were in fact for taxes. We are also unconvinced that a $ 350 payment to Alan Pinkwasser, an attorney in the Miami area, and legal fees paid to Louis Merhige were business related. Petitioner provided us with no proof as to the business purpose of the payments. We are similarly unable to allow the additional $ 200 paid in 1977 to the attorney Mike Silvers because we do not know that the amount has not already been included in the sum conceded by respondent. Petitioner also claimed utility expenses. We have no way of knowing, based on the evidence before us, exactly which of petitioner's utility bills were paid out of this account. Absent a clear showing that these were valid business expenses we cannot allow the deduction. Similarly, we cannot allow a deduction for claimed maintenance and repair expenses and a salary expense without a showing that these were incurred in the course of business. Finally, in 1977 petitioner claimed an additional film expense of $ 1,500. We have already discussed our treatment of petitioner's film purchases. Since petitioner's allowed deductions are *525 based on an estimate, we will not allow any additional specific items which were previously unclaimed. (3) Travel and Entertainment
There are two categories of travel and entertainment expenses to consider in this case. The first category are those disallowed travel and entertainment expenses. The second category of travel and entertainment are those which respondent disallowed and petitioner claims he miscategorized but were nevertheless deductible expenses. Petitioner claimed the following travel and entertainment expenses between 1974 and 1978: Entity
1974 1975 1976 1977
1978
Paris Follies
3,306
3,305
2,025
3,689
641
Griffco
6,720
7,884
3,212
--
--
Ell Gee
13,953
7,861
6,920
7,487
--
Gayety
17,846
16,442
12,722
3,819
6,318
The bulk of petitioner's proof of his entitlement to these travel and entertainment expenses is testimony at trial that petitioner did a large amount of traveling in his business. The fact that petitioner operates theaters in many states helps to substantiate this claim. Petitioner also took a trip to Europe in 1977 with Linda Rivera, Bud Luther and Luther's wife. Petitioner claims *526 that all four of them were in Europe primarily for business reasons and therefore the costs are deductible. There is, however, a problem with petitioner's evidence. He has failed to produce any evidence which shows exactly which travel and entertainment expenses were for business purposes. He kept no king of contemporaneous log indicating the time, place, amount or business purpose of any expenses. A portion of petitioner's claimed travel and entertainment expenses were obviously for travel (i.e., checks payable to a travel agency) or entertainment (i.e., checks payable to restaurants). However, without any evidence of the business purpose of the trip or meal, we cannot permit any deduction. Travel and entertainment are subject to the restrictions on all business expenses. See sec. 162. Additionally, travel and entertainment expenses must satisfy the substantiation requirements of section 274(d). In order to meet the requirements of section 274(d) petitioner must not only show a business purpose for the expenditure, he must also prove the amount, time and place of travel or entertainment *527 and, for the entertainment expenses, the business relationship to the taxpayer of every person entertained. Sec. 274(d); sec. 1.274-5(b), Income Tax Regs. Thus even though we believe petitioner did travel between his businesses, and that he entertained many of the live performers he hired, section 274(d) precludes us from estimating what expenses he may have incurred. Furthermore, the European trip, which petitioner specifically addressed, is not a deductible travel expense. Section 1.162-2, Income Tax Regs., provides in pertinent part: Only such travel expenses as are reasonable and necessary in the conduct of the taxpayer's business and directly attributable to it may be deducted. If the trip is undertaken for other than business purposes, the travel fares and expenses incident to travel are personal expenses and the meals and lodging are living expenses * * *.
We believe that petitioner got ideas for his business while in Europe, but we remain unconvinced that business was the primary reason he went to Europe. Therefore, he is not allowed to deduct the cost of the trip. Furthermore, even if the trip to Europe was *528 directly related to petitioner's business, petitioner has failed to produce any evidence to substantiate the deduction as required by section 274(d). Petitioner also contends that several of his travel and entertainment expenses were miscategorized, and that a substantial amount of travel and entertainment expenses were really film expenses. We are not convinced that any greater deduction than we have allowed above for film expenses is warranted. The other amounts petitioner claims were miscategorized as travel and entertainment expenses were payments made to the following people or entities: Lana Lake, stripper Mary Brown, employee Melody Euchman, employee Bingis Associates, sign company Alan Weinstein, attorney Petty Cash BAC, Inc. (Georgeanna Spellman) Night Owl Show The only evidence presented at trial substantiating the deductibility of these expenses was petitioner's self-serving testimony. He has failed to convince us that these payments were ordinary and necessary business expenses. There is, however, one exception in all of the above-mentioned expenses -- the payment to Bingis Associates, a sign company. We find this expense to be business related. *529 Therefore, Gayety is entitled to a deduction of $ 125 in 1975. Additional Income
We now must decide whether petitioner received the following amounts of previously unreported income in the following years: Source
1974
1975
1976
1977
Paramount Theater
$ 24,950
(return of security
deposit)
Bee Gee, Inc.
$ 4,400
$ 21,700
Cameo Productions
2,097
3,100
Flamingo Theater
3,262
GTI (divisions)
8,254
38,947
(1) Paramount Theater
Griffco was incorporated on September 1, 1972 and operated on a calendar year basis. Griffco is the corporation which operated the Paramount Theater. In 1977 petitioner received $ 24,950 as the return of a security deposit on the Paramount Theater. We must decide if this amount constitutes income to Griffco and therefore to petitioner as its sole shareholder. Generally, a recovery of a prior payment does not result in income unless there was a tax benefit in a prior year. Sec. 111; Hillsboro National Bank v. Commissioner,457 U.S. 1103 (1982). The question, therefore, is whether *530 petitioner or Griffco received a tax benefit in a prior taxable year. Respondent claims that petitioner did enjoy a prior tax benefit. He claims petitioner deducted the security deposit from taxable income in 1972. Respondent's determination is based on two facts: (1) Petitioner did not include the security deposit as an asset in 1972 even though he did include the security deposit of $ 335 held by Southern Bell as an asset; and (2) Petitioner deducted $ 33,612.80 in rent for 1972 while his annual rental expense for 1973 and 1974 was $ 50,918 and $ 51,917, respectively. Since the corporation did not exist until September 1972, at most the 1972 rental payment covered a four-month period. Petitioner argues that the security deposit is not a deductible item and since there is no evidence that the security deposit was deducted, petitioner did not realize any prior tax benefit. Moreover, petitioner argues that he was audited in 1972 and that if he had previously deducted the security deposit it would have been disallowed on audit. There is no direct proof that petitioner previously deducted the security deposit. Respondent would like us to conclude that a substantial rental *531 payment in 1972 for at most four months of operation indicates that petitioner previously deducted the security deposit. Based upon the 1973 and 1974 annual rental deductions petitioner should have incurred a rental expense of approximately $ 17,000 over a four-month period in 1972. If we accept respondent's argument, i.e., that $ 24,950 of the $ 33,612.80 deducted as rent in 1972 was in fact a security deposit, it would mean that petitioner only paid approximately $ 9,000 in rent in 1972. If we accept petitioner's argument it would mean petitioner paid over $ 33,000 in rent in 1972. Neither party has done much to convince us that they are correct. We do note, however, that petitioner did not introduce any evidence as to the terms of the lease which would have done much to support his case. In light of petitioner's failure to present this evidence, we assume it would not have supported his position. Wichita Terminal Elevator Co. v. Commissioner, supra.Petitioner has failed to prove that he did not receive a prior tax benefit in 1972 by deducting the security deposit. As a result petitioner must include the return of that deposit in his 1977 income. (2) *532 Bee Gee, Inc.; Cameo Productions, Inc. and Flamingo Theater
Respondent determined that petitioner had additional income from Bee Gee, Inc., Cameo Productions, Inc. and the Flamingo Theater. His determination is based on the disallowance of claimed film expenses. The payments which respondent has included in petitioner's income were payments made by these entities, directly to petitioner or to GTI after March 31, 1975 (the date respondent determined GTI went out of business). Petitioner claims the payments made to him from these entities were for reimbursement of film expenses. Petitioner also contends that the amounts paid to GTI were properly included in GTI's income and did not constitute dividends to him. Regarding the direct payments to petitioner, he points out that during the periods in question he did not wholly own any of the above-named theaters and that it is therefore illogical to assume that the payments to him were anything other than reimbursement for film expenses. He claims the other co-owners would not have allowed him to take out these amounts as dividends without being charged with them. There are flaws in petitioner's logic. First, none of the other *533 co-owners' tax returns are currently before the Court so there is no way for us to determine whether the other co-owners received similar payments from the entities in question. Second, noting petitioner's extensive experience in operating adult and family theaters, it is not inconceivable that the payments to petitioner could have represented some kind of payment for services. If this were the case, the other co-owners are not likely to have objected to the payments made to petitioner. Although petitioner could have been reimbursed for film expenses by these entities, he has not convinced us that these particular payments were for reimbursements of film expenses. Testimony from his co-owners as to the nature of the payments might have constituted sufficient proof. In light of petitioner's failure to produce this evidence we assume the evidence would not have supported his position. Wichita Terminal Elevator Co. v. Commissioner, supra.
Moreover, since petitioner has earned additional income from these theaters, he is subject to self-employment tax on the income. [21]
*534 Petitioner also must include in his income the amounts respondent disallowed for payments made by these entities to GTI. Since petitioner has failed to convince us that GTI was in existence after March 31, 1975, all deductions taken for payments to GTI after that date are disallowed. Since the payments went to GTI, petitioner's wholly owned corporation, which we have determined was not in existence, the amounts paid to GTI after March 31, 1975 must be included in petitioner's income. Moline Properties v. Commissioner,319 U.S. 436 (1943). (3) Dividend Income from GTI in 1974 and 1975
GTI was in existence for 12 months in 1974 and three months in 1975. Between April 1, 1974 and December 31, 1974 petitioner withdrew $ 53,061.94 in shareholder loans from the corporation. Between January 1, 1975 and March 31, 1975, petitioner withdrew $ 43,094.84 in shareholder loans, but made loans to GTI totaling $ 65,497.88. Based upon these transactions, respondent determined that the shareholder loans in excess of the contributions made by petitioner amounted to dividend income. Respondent also determined an additional $ 12,373.68 and $ 61,349.75 of payments deducted *535 by GTI in 1974 and 1975, respectively, were for petitioner's benefit and therefore constituted dividend income to him. According to respondent, the net result is that petitioner had $ 56,682 in dividend income in 1974 and long term capital gain income of $ 8,254 and $ 38,946.71, in 1974 and 1975, respectively. Petitioner contends that the withdrawals constituted bona fide shareholder loans. He further asserts that it was his practice to borrow money from one corporation to pay bills of another corporation. Sometimes these loans were recorded directly to the other corporation. Other times the loan was recorded to his loan account and then he gave the money to the cash poor corporation. Petitioner also contends that the amounts respondent claims were expended by GTI on his behalf did not provide him with any benefit. As a result, petitioner claims he should not include those sums in his individual income. Specifically, petitioner addresses payments made by GTI to Joseph and Betty Savino. Between January 10, 1975 and February 18, 1976 GTI paid the Savinos $ 57,500 in a series of post-dated checks. The checks represented repayment of a $ 50,000 loan at 15 percent interest *536 between the Savinos (as lenders) and petitioner, Gayety and GTI (as borrowers). Petitioner has failed to establish a business purpose for the $ 50,000 loan. Therefore, the payments are not deductible by GTI, Gayety or petitioner. Sec. 162. Furthermore since there was no business purpose established, we assume the loan from the Savinos provided personal benefits to petitioner who both signed the loan agreement and was the sole shareholder of GTI. We find that the payment of this loan was for petitioner's benefit and that the amount respondent determined was taxable income must be included as dividend income by petitioner. [22]
Petitioner has not presented any evidence as to the other payments made by GTI which respondent disallowed. Therefore, we reach the same result for those payments. That is, petitioner must include the payments as dividend income in 1974 and 1975. We cannot agree with respondent's determination, however, that the shareholder loans constituted dividend income *537 to petitioner. We are not convinced the amounts claimed as shareholder loans were anything but what they were purported to be. The fact that petitioner had an outstanding balance at the end of 1974 does not change our mind, nor does the fact that there were no documents evidencing the loans. The facts support petitioner's claim that he withdrew money from one corporation and deposited it into another. More importantly though, the facts indicate that substantial portions of the loans were paid back in early 1975. Thus, the amount borrowed in 1974 was not income to petitioner. In 1975, however, we have found that GTI ceased doing business. In March of 1975 petitioner had an outstanding balance in his open loan account. Not receiving any evidence to the contrary, it appears the amount of debt outstanding was forgiven. Petitioner never mentioned making additional payments after that date. Therefore, we conclude that petitioner had additional income in 1975 equal to the amount of the balance in his open loan account with GTI on March 31, 1975. In sum, petitioner had dividend income in 1974 of $ 12,373.68, and in 1975 petitioner had dividend income of $ 61,349.75 and income *538 from the forgiveness of indebtedness equal to $ 30,658.90 [($ 43,094.84 (shareholder loans in 1974) + $ 53,061.94 (shareholder loans in 1975)) - $ 65,497.88 (amount of shareholder loans repaid in 1975)]. 4460 Bay Point Road
Petitioner lived at 4460 Bay Point Road with his girlfriend, Linda Rivera, and three of his children -- Charles, Kim and Cash -- during all the years in question. The house at 4460 Bay Point Road was owned by Gayety. Petitioner was Gayety's sole shareholder. Gayety purchased the home in September, 1973. The cost basis of the building was $ 67,000, plus improvements of $ 34,769.74. The tax assessed value of the house in 1974 was $ 61,551 ($ 20,840 land and $ 40,711 building) and in 1975 was $ 86,994 ($ 27,780 land and $ 59,214 building). Gayety depreciated the house located at 4460 Bay Point Road during all the years in question. The depreciation was taken at four percent on the straight line method. Gayety's depreciation deduction was based on the following figures: Date
Cost or
Depreciation
House
acquired
other basis
for tax year
Building
12-73
$ 67,000  $ 2,680
Improvements
12-73
34,770
1,391
Land
12-73
18,000
-0- Improvements
1-74
49,646
1,986
Total $ 6,057
*539 There was no evidence presented at trial to support the claimed improvements of $ 49,464 in 1974. However, petitioner chose to capitalize the following expenses in 1974: bar sink repair
$ 200.00
upholster 2 chairs
43.53
drapery work
266.00
awning
350.00
plumbing repair
127.00
fixtures and materials
950.00
repair of receiver &
transmittor
88.00
Total
$ 2,024.53
In addition to depreciation, Gayety took annual deductions for interest, taxes, maintenance and repairs on the property. Between 1974 and 1978 Gayety deducted the following expenses: 1974
1975
1976
1977
1978
Taxes *
$ 3,099.33
Interest *
4,207.48
House Maintenance
909.00
312.00
Telephone
104.18
327.00
60.40
Gas Service
167.00
163.71
238.23
Repairs Including
(plumbing,
fixtures, exterminating,
closed circuit television,
air conditioning)
1,536.00
257.14
Pool and Garden
909.00
1,367.00
967.00
781.00
495.00
HOA
480.00
Electric
1,568.16
481.81
Supplies
701.27
*540 In 1974 and 1975 petitioner "paid" $ 6,000 in rent to live at the Bay Point Road house. The payment was made through an adjusting journal entry to his loan account with Gayety. In 1976 petitioner "paid" $ 4,800 in rent. Again, the repayment was by an adjusting journal entry on his loan account with Gayety. In 1977 and 1978 petitioner paid no rent. There was no written lease between Gayety and petitioner. Petitioner did not maintain a log or other contemporaneous record of entertaining or other business use of the home. The plan of having the corporation own the residence and allowing petitioner to rent it out was reviewed by one of respondent's revenue agents during a prior audit. Though not given extensive review, the agent indicated that if petitioner paid fair market value in rent, the arrangement would not likely be a problem. At the time of this prior audit it was indicated that fair rental value was approximately $ 7,200 per year. With the exception of $ 178 of the 1978 dues to the Homeowner's Association, respondent disallowed all of Gayety's claimed deductions for 4460 Bay Point Road based upon Code sections 162, 262, 274(a) and, from 1976 through 1978, section *541 280A.
Section 162 permits taxpayers to deduct all "ordinary and necessary" business expenses. Section 167(a)(1) provides a depreciation deduction with respect to "property used in trade or business." Section 262 specifically disallows deductions for otherwise allowable expenses unless the taxpayer can fall within its narrow scope and meet its substantiation requirements. Under 274(a) a taxpayer is not allowed to deduct the cost of any activity considered to be entertainment, recreation or amusement or of any facility used in connection with that type of activity, unless he can establish that the activity was related to a bona fide business discussion or to the active conduct of his trade or business. Section 280A disallows certain expenses connected with the business use of a home. Generally, an individual or an S corporation is not allowed to deduct any of the costs associated with the use of a dwelling unit which is used as a residence by the taxpayer or the corporate shareholders during the taxable year. There are limited exceptions to this rule which do not apply here. The initial *542 question to be considered is whether the ownership and maintenance of the realty related primarily to personal or to business purposes. In general, when the acquisition and maintenance of property such as a residence is primarily associated with profit-motivated purposes, and personal use can be said to be distinctly secondary and incidental, a deduction for maintenance expenses and depreciation will be permitted. International Artists, Ltd. v. Commissioner,55 T.C. 94, 104 (1970). Conversely, if the acquisition and maintenance is primarily motivated by personal considerations, the deductions must be disallowed. Such expenditures are not ordinary and necessary and therefore fail to qualify as a deduction under section 162. International Artists, Ltd. v. Commissioner, supra.Moreover, the disallowance of personal expenditures is expressly mandated by section 262. The above principles apply to corporate, as well as individual, taxpayers. In the former case, since the corporation cannot itself make personal use of the property, the character of an expenditure *543 is determined by reference to the benefit conferred upon shareholders, officers, or other individuals in control of corporate affairs. International Trading Co. v. Commissioner,275 F.2d 578 (7th Cir. 1960), affg. a Memorandum Opinion of this Court; International Artists, Ltd. v. Commissioner, supra.As in the case of individual taxpayers, the personal use by a shareholder of corporate property renders expenditures thereto personal and results in taxable income to the shareholder. However, where substantial business and personal motives exist, allocation becomes necessary. [23]International Artists, Ltd., supra at 105. Respondent contends that petitioner has not established a business purpose for owning the residence at 4460 Bay Point Road and therefore, none of the expenses associated with it are deductible by Gayety. Respondent further contends that even if petitioner hosted entertainers *544 at the home, he falls short of proving the home was used primarily for business purposes. Conversely, petitioner contends that business use of the property is only relevant to the extent it may serve to justify petitioner's being charged less than fair rental value for the house. Otherwise, petitioner claims that because he was charged rent, the rent was reported as income by Gayety, and the amount flowed through to petitioner as Gayety's sole shareholder, that Gayety is entitled to depreciate the cost of the residence. We agree with respondent. We believe the primary purpose of acquiring and maintaining the residence was to provide a home for petitioner's personal use and pleasure. Furthermore, without any evidence as to the percentage of business petitioner carried on at the home, we have no basis to allocate expenses between business use and personal use in 1974 or 1975. [24]
Finally, petitioner claims that if Gayety's ownership is disregarded and its deductions are disallowed, the adjusting journal entries for rent should be reversed because petitioner included that amount which flowed through the S corporation in his income for 1974, 1975 *545 and 1976. We disagree. We are not disregarding Gayety's ownership of the residence. Gayety is still entitled to deductions for taxes and interest. We have determined that Gayety did not have a business purpose for the purchase and rental of the residence; therefore, it is denied those deductions which are predicated on business purpose (Sections 162 and 167). Furthermore, contrary to petitioner's argument, there is no reason to reverse the journal entries which increased petitioner's loans due to Gayety. Petitioner has failed to prove he actually made cash payments to Gayety to cover the rental expenses accrued to his loan account. Moreover, petitioner, in effect, merely rented a house from Gayety. If petitioner had rented elsewhere, his rental payments would be income to the landlord, and a nondeductible personal expense to petitioner. Here, Gayety, the landlord, received and accrued rental income in the form of an increase in petitioner's shareholder loan account. As with any landlord, such income is properly attributable to Gayety, even though, under the circumstances, it may not deduct maintenance and depreciation for lack of business purpose. Petitioner received a benefit *546 for which he paid. [25] Neither the benefit, nor the payments, is reversed merely because Gayety is a subchapter S corporation and petition is its sole shareholder. [26]
In sum, Gayety is allowed the deductions for interest and taxes, but all other maintenance type deductions were properly disallowed, as was depreciation. Basis in Paris Follies
Petitioner maintained open loan accounts with all of his corporations. Until 1974 petitioner's corporations each also maintained an "LP Theater" (Loans payable, Theater) account. The LP Theater accounts were designed to reflect the total amount of outstanding intercompany loans. During the 1974 taxable year the LP Theater accounts were replaced with reciprocal accounts to record the intercompany transactions. Petitioner *547 closed out the LP Theater accounts when he changed to reciprocal accounts. Petitioner did not retroactively allocate the amounts outstanding in the LP Theater accounts among his corporations. Instead, petitioner interjected himself individually into the middle of the transactions and either credited or debited his open loan account to reflect the balance in the LP Theater account. Thus, a corporation which had a positive balance in its LP Theater account became indebted to petitioner rather than any of the other corporations. Simultaneously, petitioner became indebted to those corporations which had negative LP Theater accounts by taking on the debts of other corporations. In 1974 Paris Follies had a positive balance of $ 82,823 in its LP Theater account. After making the adjusted journal entries, Paris Follies' books indicated the corporation was indebted to petitioner for $ 82,823. Petitioner also claims that in 1977 similar journal entries were made. The loan accounts between Paris Follies and GTI, Cameo and Griffco indicated that Paris Follies was indebted to the extent of $ 85,063.50. Specifically, Paris Follies owed GTI $ 19,771.52, it owed Cameo $ 3,086.96 and *548 it owed Griffco $ 62,205.02. According to petitioner, adjustments were made so that the amounts Paris Follies owed these three entities were then owed to petitioner. Again petitioner claims these journal entries served to decrease petitioner's basis in GTI, Cameo and Griffco while simultaneously increasing his basis in Paris Follies. The only amount in controversy here is the $ 62,205.02 owed to Griffco. In 1975 Paris Follies owned and operated the Capitol Theater in Chattanooga, Tenn. During 1975 improvements were made on the Capitol Theater. Petitioner claims to have personally expended $ 12,670.30 on the improvements at the Capitol Theater. Also in 1975 petitioner had advanced $ 91,655 to Griffco. In that same year, Griffco advanced a total of $ 119,487.85 to Paris Follies. The advance was in the form of one payment of $ 62,353.33 and a second payment of $ 57,134.52. In 1975 petitioner withdrew $ 45,790.62 in excess of his contribution from Paris Follies. If Griffco had not advanced the $ 91,655 to Paris Follies earlier that year, petitioner would have been unable to make this withdrawal. In his notice of deficiency respondent determined that petitioner was not entitled *549 to a loss suffered by Paris Follies in 1974 in the amount of $ 39,508.58 because the loss exceeded petitioner's basis in the S corporation. Respondent also determined that petitioner realized taxable income in 1975 and 1976 in the respective amounts of $ 37,609.62 and $ 55,158.88 reflecting the extent to which loan repayments exceeded petitioner's basis in Paris Follies. We must decide: (1) whether journal entries on the books of Paris Follies, which substituted petitioner as a creditor of Paris Follies for certain of petitioner's other wholly owned S corporations; increased petitioner's basis in Paris Follies; (2) whether expenditures made in 1975 for improvements on the Capitol Theater serve to increase petitioner's basis in Paris Follies; and (3) whether advances from Griffco to Paris Follies increased petitioner's basis in Paris Follies. (1) Paris Follies Journal Entries
Under former section 1374 [27] a shareholder's loss is limited to his adjusted basis in his stock plus his adjusted basis in any indebtedness owed to him by the corporation. Sec. 1374. Moreover, in S corporations, loan repayments in excess of a shareholder's basis are taxable income to that shareholder. *550 Cornelius v. Commissioner,494 F.2d 465 (5th Cir. 1974). [27]
*551 Petitioner contends the adjusting journal entries which occurred when he changed from using LP Theater accounts to reciprocal accounts in effect served to increase his basis in some of his corporations while correspondingly decreasing his basis in other corporations. Petitioner relies on section 1374(c)(2)(B) claiming the adjusting journal entries for Paris Follies altered the adjusted basis of indebtedness of the Paris Follies to him as its shareholder, and therefore increased the net operating loss he was entitled to claim for the 1974 taxable year. Petitioner further asserts that the advances made by his other corporations to cover the expenses of Paris Follies came from "either funds petitioner had contributed to [his] corporations or previously taxed income. In either event the amounts previously had been taxed to petitioner as Subchapter S pass through income or compensation." According to petitioner, this is further evidence of petitioner's entitlement to an increase of his basis in Paris Follies. Respondent argues that actual economic outlay is required before section 1374(c)(2)(B) applies; that in this case petitioner merely made paper changes in the indebtedness *552 between his corporations and himself; that petitioner failed to show he actually paid out any monies on behalf of Paris Follies; and that shifting of journal entries did not leave petitioner in a materially poorer situation. We agree with respondent. In Underwood v. Commissioner,63 T.C. 468 (1975), affd. 535 F.2d 309 (1976), we faced a similar question. In that case taxpayers, husband and wife, were the sole shareholders of two corporations operating cafeterias specializing in barbecue. One of the corporations (Albuquerque) made an election to be treated as a subchapter S corporation. The regular corporation (Lubbock) was very profitable and made a series of loans to Albuquerque in return for demand notes bearing six percent interest. In order to increase their basis to be able to absorb the subchapter S loss, Lubbock surrendered the demand notes it was holding, the taxpayers substituted a personal demand note to replace it and the S corporation issued a demand note for the same amount to the taxpayers. The net effect was that, after the paper transactions, the taxpayers owed Lubbock for the loan it had originally made to the S corporation *553 and the S corporation owed money to the taxpayers. Before the transactions the S corporation had never made any payments of principal or interest on the loans. Sometime later the S corporation paid all of the accrued interest owing to Lubbock. The taxpayers also made an interest payment. A year later the S corporation made another interest payment to Lubbock. Approximately a year or so after that the taxpayers made another payment for interest and ultimately paid off the loan. In holding that the transaction did not serve to increase the taxpayer's basis in the S corporation, both the Tax Court and the Fifth Circuit analogized the transaction to a loan guarantee. Furthermore, in affirming the Tax Court decision the Fifth Circuit stated: In the transaction at issue in this case, the taxpayers in 1967 merely exchanged demand notes between themselves and their wholly owned corporations; they advanced no funds to either Lubbock or Albuquerque. Neither at the time of the transaction, nor at any other time prior to or during 1969 was it clear that the taxpayers would ever make a demand upon themselves, through Lubbock, for payment of their note. Hence, as in the guaranty situation, *554 until they actually paid their debt to Lubbock in 1970 the taxpayers had made no additional investment in Albuquerque that would increase their adjusted basis in an indebtedness of Albuquerque to them within the meaning of section 1374(c)(2)(B). [535 F.2d at 312. Footnote refs. omitted.] Petitioner argues that the facts in Underwood are substantially different from the facts of this case because Underwood involved loans between an S corporation and a C corporation whereas here the loans were between all wholly owned S corporations. It is apparently petitioner's position that in this case the funds advanced to Paris Follies came from previously taxed income so there was an economic outlay be petitioner in addition to his decrease in basis to other of his S corporations. We do not agree. The evidence does not support petitioner's contention that the advanced funds must have come from previously taxed income. Rather, the facts indicate petitioner did not receive any net income from his subchapter S corporations between 1974 and 1978. He only received $ 35,000 in salary in 1974. More importantly, there is no evidence to indicate that petitioner increased *555 his investment in Paris Follies. These journal entries are merely paper transactions without economic substance. Petitioner acknowledges that the transactions at issue in the instant case are appropriately analogized to the shareholder loan guarantee situation. In so acknowledging, however, petitioner claims this Court is bound by the decision of Selfe v. United States,778 F.2d 769 (11th Cir. 1985), and that he is therefore entitled to increase his basis in Paris Follies. In Estate of Leavitt v. Commissioner,90 T.C. 206 (1988), we reiterated our position that the guarantee of loan without actual economic outlay does not increase a shareholders' basis in the corporation. However, the Eleventh Circuit, in Selfe v. United States,778 F.2d 769 (11th Cir. 1985), held that although economic outlay is required to increase a shareholders' basis, it is not always necessary for the shareholder to actually absolve the corporation's debt to pass the test. If the facts demonstrate that in substance the shareholder borrowed funds and advanced *556 them to the corporation, an increase in basis is warranted. The instant case is appealable to the Eleventh Circuit, and we are constrained to follow the law in that circuit ( Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971)). However, the facts of the case before us do not fall within the scope of the Eleventh Circuit's holding in Selfe.
In Selfe the shareholders made loan guarantees to disinterested third parties in arm's-length transactions. Clearly, acting as a guarantor for an arm's-length loan with a disinterested third party is not the same as interjecting oneself as the middleman in several loan obligations between one's wholly owned small business corporations. Consequently, the result here is not controlled by the Eleventh Circuit's holding in Selfe.
In this case petitioner is attempting to alter his basis in several of his S corporations by way of journal entries. There does not appear to be any economic substance to these transactions. It is understandable that petitioner wanted to change from using the LP Theater account to reciprocal accounts, but making journal entries attributing *557 the indebtedness and accounts receivable to petitioner is not equivalent to economic outlay in terms of section 1374. Therefore, petitioner is not entitled to increase his basis in Paris Follies for journal entries made either in 1974 or 1977. (2) Capitol Theater Improvements
In 1975 improvements were made at the Capitol Theater in Chattanooga, Tenn. The Capitol Theater was owned and operated by Paris Follies. Petitioner claims he personally expended $ 12,670.30 for the improvements which were made. Petitioner submitted several hundred pages of invoices and receipts for work done or supplies purchased for the Capitol Theater in Chattanooga, Tenn. Many of these bills were paid in cash and others were paid by petitioner's corporations. None of the receipts indicate that the payment came from petitioner. In the absence of any evidence connecting the actual payment with petitioner, there is no reason to increase his basis in Paris Follies. (3) Advances from Griffco to Paris Follies
Petitioner contributed $ 91,655 to Griffco. In turn Griffco contributed $ 119,487.85 to Paris Follies. Petitioner then withdrew $ 45,790.62 in excess of his contribution from Paris *558 Follies. Petitioner argues that in substance Griffco was merely a conduit for taxpayer's funds to flow to Paris Follies. Presumably, petitioner believes it was as if petitioner contributed $ 29,301.67 to Griffco and $ 62,353.33 to Paris Follies and at year end Paris Follies repaid $ 45,790.62 to petitioner. Thus, petitioner claims his basis in Paris Follies should reflect these advances. Respondent argues that petitioner has failed to meet his burden of proof that advances from Griffco to Paris Follies are in substance the same as if petitioner made the contribution to Paris Follies. We agree with respondent. Petitioner has not presented any evidence to support his conduit theory. It appears that petitioner is trying to rearrange what really occurred in order to prevent an increase in his taxable income. We decline to allow petitioner to come in after the fact and "readjust" his bases in his wholly owned S corporations in order to prevent the incidence of taxation on earned income. If what petitioner wanted to do was to "loan" $ 62,000 in 1975 to Paris Follies and $ 29,000 to Griffco -- that is how he should have structured the arrangement. Petitioner is not entitled to *559 an increase in his basis in Paris Follies for loans made to Griffco which then in turn loaned money to Paris Follies. Head of Household Filing Status, Income Averaging
(1) Head of Household
Petitioner had custody of his sons Charles and Cash, both of whom lived with him at 4460 Bay Point Road. Petitioner's daughter Kim also lived with petitioner even though her mother had legal custody. In addition to providing Kim's housing, he also paid $ 50 per week for her support and paid for her clothing, education and medical expenses. As a result, petitioner claims he is entitled to have his taxes determined using the head of household filing status. Sec. 1(b). Section 1 sets forth the rate of tax to be imposed on taxpayers. Those persons who qualify as head of household are taxed at slightly more favorable rates than other single taxpayers. Head of household is defined in section 2(b). An individual qualifies as the head of a household only if the following requirements are met -- (1) the taxpayer must be single at the close of the taxable year; and (2) the taxpayer is not a surviving spouse; and * * * (3) the taxpayer maintains as his home a household which *560 is the principal place of abode for more than one half of the taxable year of (a) a single child or the single descendant of a child; * * *. Petitioner meets the requirements and is therefore eligible to have his taxes determined using the head of household rates. Petitioner was single during all the years in question. Petitioner was not a surviving spouse and petitioner maintained a household which was the principal place of abode for at least one half of all the years in question for three of his children. (2) Income Averaging
Petitioner claims he is also eligible to income average his taxable income under section 1301 [28] for the years in question. Petitioner raised the issue in his petition. Although respondent perfunctorily denied the allegation in his answer, he did not address the issue at trial or on brief. We therefore deem respondent to agree that petitioner is a person entitled to the benefits of income averaging. However, since section 1301 relies upon specific computations spanning several years, and since petitioner's taxable income *561 must still be determined for the years in issue, we cannot, at this juncture, determine whether petitioner meets the computational requirement. Therefore, after the tax is computed for all the years in question, if petitioner meets the computational requirements of section 1301 he is entitled to its benefit. Net Operating Loss Carrybacks and Carryforwards
Petitioner claimed to have suffered net operating losses (NOLs) in 1974, 1975, 1976 and 1977. He filed for refunds in the 1972 taxable year as a result of NOL carrybacks from 1974 and 1975. Sec. 172. Petitioner carried forward NOLs from 1976 and 1977 to 1978. After respondent audited petitioner and redetermined his income and deductions, petitioner's NOLs for 1974, 1975 and 1976 did not exceed his gross income for those years. If respondent's determination is correct petitioner would not be entitled to any of the NOL carrybacks or carryforwards. In this case, since petitioner's ultimate gross income and allowable deductions must still be computed it is not yet possible to determine whether NOLs excess gross income. If after computations there is no NOL in excess of gross income petitioner would not be entitled to *562 any carryback or carryforward and the amounts so claimed must then be recaptured. The deficiencies from 1969, 1970 and 1973 also resulted from the disallowance of certain investment tax credit (ITC) carrybacks. [29] In 1976 petitioner filed a Form 1045 for a tentative refund of $ 300, from an unused ITC from 1972. Respondent allowed $ 60 of the credit to be applied to the 1969 taxable year and $ 60 to 1970. The remaining $ 180 was carried forward to 1973. After respondent audited petitioner for 1974, he disallowed an NOL carryback from 1974 to 1972. As a result there was sufficient gross income in 1972 to absorb the $ 120 unused ITC carried back and the $ 180 carried forward. Therefore, respondent disallowed the $ 60 credits in 1969, 1970, and the $ 180 credit in 1973. A similar situation arose in the 1975 taxable year. Petitioner had an unused ITC of $ 2,956 in that year. He filed a Form 1045 for refund applying *563 the 1975 credit to the 1973 tax year. Respondent did not challenge petitioner's right to the ITC, but determined there was adequate gross income in 1975 to use up the credit in 1975. Again, petitioner's entitlement to a carryback of this credit cannot be determined until the computations in these cases are completed. Respondent determined that an ITC of $ 2,649 taken in 1975 was subject to recapture in 1976. The equipment for which the credit was taken was purchased in December 1975 and disposed of in 1976. Section 47(a) provides that when qualified section 38 property is disposed of or ceases to be section 38 property before the expiration of the stated useful life of the property used in determining the amount of the investment tax credit, the taxpayer must recapture the difference between what the credit would have been based upon the actual useful life of the section 38 property and the amount of the credit actually claimed. Since the equipment in question was not used for three years, the useful life petitioner claimed, no investment tax credit is allowed and the amount taken in 1975 must be recaptured in 1976. Sec. 47(a). Additional Losses on Corporate Liquidations
*564 Ninth Street Amusement Company, Inc., Adam and Eve Theaters, Inc., and Carib Theater Productions, Inc. went out of business in 1973, 1975 and 1977, respectively. The controversy here is whether petitioner is entitled to claim bad debt deductions for loans he had outstanding to all the corporations when they went out of business and whether petitioner is entitled to a capital loss on the liquidation of Ninth Street Amusements. Petitioner claims he is entitled to a bad debt deduction for 1973 in the amount of $ 6,743 on the liquidation of Ninth Street Amusements Inc., a subchapter S corporation, in addition to a capital loss of $ 2,826. For 1975 petitioner claims a business bad debt of $ 17,650 in regard to Adam and Eve Theaters, and for 1977 he claims a business bad debt of $ 21,778 for the liquidation of Carib Theater. Respondent contends that petitioner is not entitled to any capital loss or bad debt deduction in 1973. Respondent concedes petitioner is entitled to a $ 17,650 loss on the liquidation of Adam and Eve Theaters in 1975, but that the amount must be taken as a capital loss, not as a bad debt deduction. Similarly, respondent concedes petitioner is entitled to a *565 loss of $ 21,778 on the liquidation of Carib Theater Productions, Inc. in 1977, but that it must be taken as a capital loss and not as a bad debt deduction. We first decide whether petitioner is entitled to either a bad debt deduction and/or a capital loss in 1973. Petitioner contends that he did not receive any assets on the dissolution of Ninth Street Amusements, Inc. Further, petitioner asserts his basis in his corporate stock was $ 2,826 and that the corporation owed him $ 6,743 on a loan. In support of his claim petitioner submitted the corporate tax return and his personal tax return for 1973. These documents indicate that petitioner earned $ 5,000 in salary from Ninth Street Amusements, Inc., that Ninth Street Amusements, Inc. had net income of $ 2,743 and that the corporation's cumulative losses decreased from $ 19,330 to $ 16,494. Under the circumstances outlined above we are unable to allow petitioner to take both the bad debt deduction and the capital loss. Ninth Street Amusements, Inc. was a subchapter S corporation. As such, net operating losses affected petitioner's basis in the corporation and his basis in any indebtedness owed to him by the corporation. Sec. *566 1376(b). Petitioner has not proved that he had any basis left either in his stock or the debt owed to him by the corporation. As a result, petitioner is not entitled to either the bad debt deduction or the capital loss in 1973. We turn now to 1975. Section 166 provides generally for a deduction for any debt which becomes worthless during the taxable year. Section 166(d) excludes noncorporate taxpayers from the benefits of this provision if the debt was a nonbusiness bad debt. Instead, a taxpayer may treat the amount as a short-term capital loss. Nonbusiness bad debts are defined in section 1.166-5(b), Income Tax Regs., of the regulations as any debt other than: (1) A debt which is created, or acquired, in the course of a trade or business of the taxpayer, determined without regard to the relationship of the debt to a trade or business of the taxpayer at the time when the debt becomes worthless; or (2) A debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. If there is a proximate relationship between the debt *567 and the taxpayer's trade or business there is a business bad debt. Section 1.166-5(b), Income Tax Regs. The Supreme Court has addressed this issue on several occasions. In Putnam v. Commissioner,352 U.S. 82 (1956), the Court held that an attorney who ventured into the publishing business and who advanced money pursuant to his obligation as a guarantor, was not in the trade or business of publishing. The worthless debts were therefore nonbusiness bad debts and were treated as a capital loss. In Whipple v. Commissioner,373 U.S. 193 (1963), the taxpayer had made cash advances to a corporation in which he had an approximately 80-percent interest. He did not receive any salary from the corporation. The Supreme Court held that devoting one's time and energy to the affairs of a corporation without more is not the trade or business of that individual. The Court went on to say: When the only return is that of an investor, the taxpayer has not satisfied his burden of demonstrating that he is engaged in a trade or business since investing is not a trade or business and the return to the taxpayer, though substantially the *568 product of his services, legally arises not from his own trade or business but from that of the corporation. * * * [373 U.S. at 202.] In United States v. Generes,405 U.S. 393 (1972), the Supreme Court held that in determining whether a bad debt had a "proximate" relation to the taxpayer's trade or business, the taxpayer had to demonstrate a "dominant," rather than "significant," business motive for making the loan. Petitioner argues he is entitled to a business bad debt of $ 17,650 on the liquidation of Adam and Eve Theaters. Adam and Eve was a regular C corporation. Petitioner did not earn a salary from Adam and Eve. Petitioner has provided no evidence that his loans to Adam and Eve were for anything other than the protection of his investment. Therefore, petitioner may only treat his loss in 1975 as a capital loss and not as a business bad debt. Petitioner similarly claims entitlement to a bad debt deduction in 1977, the first and last year of operation for Carib Theater Productions, a Subchapter S corporation. In that time petitioner drew *569 no salary. He loaned the corporation $ 112,270 and assumed outstanding liabilities of $ 16,295 (less a $ 298 receivable from Ell Gee). The corporation lost $ 128,665. Respondent did not dispute petitioner's treatment of $ 106,887 of the loss for Carib Theater productions and concedes petitioner is entitled to the additional $ 21,778 loss. The issue is thus not whether the loss occurred, but its character. Petitioner claims the loans were made and the liabilities assumed to protect his salary and subchapter S income. Accordingly petitioner claims the debts qualify as business bad debts and are currently deductible. It is respondent's position that the additional loss must be taken as a capital loss. Respondent relies on the fact that petitioner drew no salary and Carib lost over $ 100,000 in its only year of operation. Thus, respondent concludes that petitioner could not legitimately have been motivated to loan this money either to protect his salary or his subchapter S income. On the limited evidence before us we conclude that the amount in dispute was not a business bad debt. It seems rather that petitioner contributed capital to his corporation. Therefore, on the liquidation *570 of the corporation, he is only entitled to treat the loss as a capital loss. Transferee Liability
In a separate notice of deficiency, docket No. 4032-85, and as an alternative argument respondent assessed deficiencies against petitioner as transferee of GTI. Respondent's primary position is that GTI ceased doing business on March 31, 1975. As a result all payments made to GTI are nondeductible and presumably GTI did not realize income. We agree with respondent's primary position. The existence of transferee liability presupposes the existence of tax liability on the part of the transferor. See Januschke v. Commissioner,48 T.C. 496 (1967). In this case GTI was not in business after March 31, 1975 and it did not incur any tax liability after that date. As a result, petitioner is not liable as transferee of GTI. [30]
Fraud
Finally, we must determine if petitioner is liable for fraud for 1974 through 1978 inclusive in addition to the years before us solely by reason of respondent's disallowance of investment tax credit *571 carrybacks and carryforwards and net operating loss carrybacks. Respondent's claim of fraud is based primarily upon the activity of one bank account. Petitioner opened the "My Third Wife, George" bank account in 1973. Petitioner claims the account was opened when he produced a film of the same name, and that the account started as a business account. Petitioner claims further that at some point he began using the account to rent or buy films for rental to his S corporations. Eventually, he began using the account for personal expenses. Respondent alleges that petitioner used the account to pay personal gambling debts and that many of the deposits into the account came from petitioner's wholly owned corporations which deducted these payments as film rental expenses. In other words, respondent claims that petitioner opened this bank account and used it as a way of fraudulently deducting nondeductible personal expenses. Respondent also alleges that petitioner intentionally kept information about this account from his attorneys and accountants to further conceal his fraudulent scheme. Petitioner's corporations did, in fact, deduct payments made to the "My Third Wife, George" *572 bank account. The last of these deductions was made in March, 1975. Respondent offered evidence of deposits to and expenditures from the "My Third Wife, George" account for the period August 29, 1975 to August 31, 1976. The bank records indicate that $ 143,150 was deposited into the account and that $ 142,800 was expended from the account. The evidence indicates that a large portion (at least $ 42,500) of the expenditures were made to casinos. These facts, combined with testimony from several witnesses that petitioner gambled, form the crux of respondent's allegations. Petitioner offered a different explanation for the deductions, deposits and expenditures. Petitioner claims that in 1974 and early 1975 films were in fact rented from the "My Third Wife, George" bank account. Petitioner contends that as a result, the corporations renting the films were entitled to the deductions. Petitioner further asserts that the "My Third Wife, George" account acted as a "rental agent", just as GTI Productions, Inc. did, and that its use as such was eventually phased out. Petitioner asserts that the last deduction in March 1975 supports his claim that the account's use as a rental agent *573 was temporary. Petitioner states that the fact that checks were paid out of the "My Third Wife, George" account in late 1975 and 1976 to several casinos is irrelevant to a determination of fraud. First, no deposits were deducted by any corporation during the period reflected in the bank records. Second, no deductions were ever taken by the "My Third Wife, George" account for these or any other expenditures. Third, petitioner claims that he owed the casinos money from his lines of credit but that he did not gamble the money away; rather he used the lines of credit as interest-free loans which he then paid back using the "My Third Wife, George" account. Finally, even if the payments were for gambling debts, petitioner argues since no deductions were taken by any of the corporate entities, there is still no evidence of fraud.
Respondent has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). To meet this burden respondent must show petitioner intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent *574 the collection of taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983). Respondent must prove fraud for each year he asserts the addition to tax under section 6653(b). Shaw v. Commissioner,27 T.C. 561 (1956), affd. 252 F.2d 681 (6th Cir. 1958). We consider the entire record to determine whether fraud exists. Estate of Pittard v. Commissioner,69 T.C. 391, 400 (1977); Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978); Stratton v. Commissioner,54 T.C. 255, 284 (1970). Fraud is not imputed or presumed. Beaver v. Commissioner,55 T.C. 85, 92 (1970). Respondent may, however, prove fraud through circumstantial evidence since direct evidence of the taxpayer's intent is rarely available. Rowlee v. Commissioner, supra at 1123. We are not entirely convinced that the "My Third Wife, George" account operated in the manner described by petitioner. We are also not convinced that the account *575 was used entirely for personal expenses. Respondent was unable to show us by clear and convincing evidence that no film rentals occurred during the time when film rental deductions were taken. The fact that no film rentals occurred after the deductions stopped is not evidence of fraud. Moreover, respondent cannot rely solely on petitioner's failure to prove error in respondent's determination to meet his burden of proving fraud. Habersham-Bey v. Commissioner,78 T.C. 304, 312 (1982); Otsuki v. Commissioner,53 T.C. 96, 106 (1969); Pigman v. Commissioner,31 T.C. 356, 370 (1958). Respondent's supplemental arguments for fraud rest on what he terms "abusively used corporate deductions and corporate funds for personal expenses." Respondent claims that excessive travel and entertainment deductions which petitioner could not substantiate, corporate ownership and deduction of expenses for the residence where petitioner lived and large shareholder loans with small amounts of declared taxable income support a finding of fraud.
First, *576 the inability to substantiate a deduction, standing alone, is not fraud. The fact that travel and entertainment substantiation requirements were explained to petitioner by his accountant and that petitioner did not follow his instructions may be evidence of negligence. However, a taxpayer is guilty of fraud only if he claims deductions to which he knows he is not entitled. Second, the fact that petitioner withdrew substantial sums from his wholly owned corporations in the form of shareholder loans is not fraudulent. In 1974 petitioner received a shareholder loan from GTI Corporation in the amount of $ 56,311. In 1975 petitioner received a "shareholder loan" [31] from Gayety Theaters in the amount of $ 72,794. Respondent has failed to prove by clear and convincing evidence that the amounts were not in fact loans. The evidence indicates money flowed freely from one corporation to another often via petitioner's loan accounts. Petitioner had outstanding loan amounts due to certain of his corporations while other of the corporations owed him money. There is no question that petitioner's recordkeeping was very sloppy and that the sloppiness prevents us from determining exactly *577 what petitioner invested and what he withdrew from his various corporations. While we do not condone such erratic bookkeeping, and we recognize the possibility that the amounts were not truly loans, we nevertheless do not find petitioner possessed the requisite intent to have committed tax fraud. Finally, respondent claims that since the corporation owned the house petitioner lived in and deducted the cost of maintenance and improvements, petitioner is liable for additions to tax for fraud. We have found that Gayety is not entitled to deduct the cost of maintenance and improvements on the home. However, that does not mean that the plan of corporate ownership of the home was fraudulent. In this case petitioner lost his personal homestead election under Florida law by having the corporation own the residence. Also, during an audit of earlier years, one of respondent's revenue agents indicated to petitioner that corporate ownership of the home would most *578 likely not be a problem if fair rental value was paid. While we were unable to determine whether petitioner ever actually "paid" the rent he accrued to his loan account with Gayety, it seems that petitioner attempted to partially comply with the revenue agent's advice (at least in 1974 through 1976). Thus, we remain unconvinced that Gayety's ownership of the residence amounted to fraud by petitioner. After having viewed the witnesses at trial and taking notes of petitioner's level of formal education, we do not believe he intended to evade taxes he knew were owing. Petitioner is an astute businessman and has hired accountants to do his tax planning. No evidence presented at trial convinced us that petitioner conveyed an intent to carry out fraudulent schemes with his accountants, nor were we convinced he tried to evade taxes without his accountants' knowledge. Additionally, we do not find fraud in 1969, 1970, 1972 or 1973, the years before us solely by reason of respondent's disallowance of net operating loss carrybacks and investment tax credit carrybacks and carryforwards. To reflect the foregoing, Decision in docket No. 22089-80 will be entered under Rule 155. *579 Decision in docket No. 4032-85 will be entered for petitioner.
Appendix A >100> >101> 1969
1970
1972
1973
1120-S Income-Paris Follies
Distributors Income-Paris Follies
N.O.L. Deduction-Paris Follies
1120-S Income-Griffco
1120-S Income-L. C. Griffith
1120-S Income-Ell Gee, Inc.
1120-S Income-Gayety Theaters
Deemed dividend income - GTI
Dividend exclusion
Long-Term Capital Gain-GTI
Long-Term Capital Gain deduction
Carryback for year ending 12/31/74
$ 34,220
Carryback for year ending 12/31/75
22,794
Income from Bee Gee, Inc.
Income from Cameo Productions
Income from Flamingo Theater
Income from Paramount Security Dep.
Income from Carib Theater
NOL Carryforward year ending 12/31/77
NOL Carryforward year ending 12/31/76
Itemized deductions
Exemptions
$ 57,014
1974
1975
1976
1120-S Income-Paris Follies
$ 12,884 $ 28,017 $ 67,409 Distributors Income-Paris Follies
36,610 55,159 N.O.L. Deduction-Paris Follies
39,509 1120-S Income-Griffco
12,313 35,384 (8,427)
1120-S Income-L. C. Griffith
4,021 10,111 14,618 1120-S Income-Ell Gee, Inc.
31,908 31,073 24,482 1120-S Income-Gayety Theaters
58,054 90,073 88,252 Deemed dividend income - GTI
56,682 Dividend exclusion
(100)
Long-Term Capital Gain-GTI
8,254 38,947 Long-Term Capital Gain deduction
(1,389)
(18,736)
Carryback for year ending 12/31/74
Carryback for year ending 12/31/75
Income from Bee Gee, Inc.
4,400 21,700 Income from Cameo Productions
2,097 3,100 Income from Flamingo Theater
3,262 Income from Paramount Security Dep.
Income from Carib Theater
NOL Carryforward year ending 12/31/77
NOL Carryforward year ending 12/31/76
Itemized deductions
(7,511)
(6,167)
(7,081)
Exemptions
(3,000)
(3,000)
(3,000)
$ 216,025 $ 267,726 $ 237,774 *580 1977
1978
1120-S Income-Paris Follies
$   9,910
$ 47,419
Distributors Income-Paris Follies
N.O.L. Deduction-Paris Follies
1120-S Income-Griffco
1120-S Income-L. C. Griffith
1120-S Income-Ell Gee, Inc.
2,780
1120-S Income-Gayety Theaters
117,558
Deemed dividend income - GTI
21,301
72,112
Dividend exclusion
Long-Term Capital Gain-GTI
Long-Term Capital Gain deduction
Carryback for year ending 12/31/74
Carryback for year ending 12/31/75
Income from Bee Gee, Inc.
Income from Cameo Productions
Income from Flamingo Theater
Income from Paramount Security Dep.
24,950
Income from Carib Theater
21,778
NOL Carryforward year ending 12/31/77
61,923
NOL Carryforward year ending 12/31/76
21,756
Itemized deductions
Exemptions
$ 198,277
$ 223,210
Total adjustments per statutory notice of deficiency Appendix B >100> >101> Disallowed Deduction
1973
1974
1975
(a) Add'l film
expenses
$ 31,850   $ 197,014
(b) Finder's
fee
10,400   10,400
(c) Add'l auto
expenses
3,033.50
1,629
(d) Add'l
contract/casual
labor
150   (f) Misc. itemized
8,500   Previously Unclaimed Deduction
(g) Add'l losses on
corp. liquidation
of 9th St. Amusement
$ 2,836
Adam & Even Theaters
Carib Theater Productions
(h) Add'l unclaimed
deductions for
(1) Rent for Parris Follies
Pussycat Theater
(2) Payment w/regard to
Liberty Bank & Trust Acct.
(3) Legal services
(4) For checks disbursed
from Intercontinental
(i) Advertising ($ 21,621.33)
(ii) Taxes ($ 4,489.45)
(iii) Utilities ($ 1,124.49)
(iv) Salary ($ 500)
(v) Film purchases ($ 1,500)
(vi) Repairs and
maintenance ($ 200)
(vii) Legal & accounting
fees ($ 2,462.54)
(5) Checks to Nat. Film Co.
(6) Legal fees erroneously
charged to P's loan acct.
*581 Disallowed Deduction
1976
1977
1978
(a) Add'l film
expenses
$ 149,400
$ 39,364   $ 24,553
(b) Finder's
fee
10,400
4,200   5,200
(c) Add'l auto
expenses
4,926
1,503   (d) Add'l
contract/casual
labor
3,150
900   (f) Misc. itemized
2,700
Previously Unclaimed Deduction
(g) Add'l losses on
corp. liquidation
of 9th St. Amusement
Adam & Even Theaters
Carib Theater Productions
(h) Add'l unclaimed
deductions for
(1) Rent for Parris Follies
Pussycat Theater
23,501
49,918   1,800
(2) Payment w/regard to
Liberty Bank & Trust Acct.
10,349.36
(3) Legal services
5,000
(4) For checks disbursed
from Intercontinental
31,927   (i) Advertising ($ 21,621.33)
(ii) Taxes ($ 4,489.45)
(iii) Utilities ($ 1,124.49)
(iv) Salary ($ 500)
(v) Film purchases ($ 1,500)
(vi) Repairs and
maintenance ($ 200)
(vii) Legal & accounting
fees ($ 2,462.54)
(5) Checks to Nat. Film Co.
8,849
(6) Legal fees erroneously
charged to P's loan acct.
4,200
*582 Appendix C >100> >101> LOAN ACCOUNTS - OUTSTANDING BALANCES AT YEAR END
1974
1975
Loans to
Loans from
Loans to
Loans from
Shareholders
Shareholders
Shareholders
Shareholders
Gayety
-0-
($ 94,762)
($ 72,794)
-0-
L. C. Griffith
-0-
( 86,549)
83,635 -0-
Griffco
-0-
886 -0- 92,541
Paris Follies
-0-
-0- 108,189 102,570
Ell Gee
5,187
157,627 -0- 192,459
Carib
$ 5,187
($ 22,798)
$ 264,618 $ 387,570
1976
1977
Loans to
Loans from
Loans to
Loans from
Shareholders
Shareholders
Shareholders
Shareholders
Gayety
$ 82,706
-0-
$ 343,093
-0-
L. C. Griffith
52,190
-0-
55,377
-0-
Griffco
-0-
68,797
Paris Follies
9,014
127,620
9,877
126,394
Ell Gee
-0-
294,869
-0-
276,805
Carib
-0-
112,270
$ 143,910
$ 603,556
$ 408,347
$ 403,199
1978
Loans to
Loans from
Shareholders
Shareholders
Gayety
$ 370,332
-0-
L. C. Griffith
Griffco
Paris Follies
28,623
134,268
Ell Gee
Carib
$ 398,955
$ 134,268
(Per Balance Sheet on Corporate Tax Returns) Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code applicable to the year at issue and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. For convenience docket No. 22089-80, the case involving petitioner's individual tax liability, and docket No. 4032-85, the case involving petitioner's tax liability as transferee of GTI were consolidated for trial, briefing and decision. ↩
3. In his Reply Brief, filed May 27, 1987, respondent made the following concessions: 1974 1975 1976 1977
1978 Depr. for automobiles
$ 2,293
$ 2,293
$ 2,293
Contract labor
1,075
1,250
$ 400
$ 1,000
Freight expenses
720
Loss (Paris Follies) Figures have been rounded to the closest dollar amount. *
15,470
Legal Fees
2,250
4,000
2,000
Travel & Entertainment *
9,649
Expenses for Operating
Climax Theater *
8,118
Loss (Ell Gee, Inc.)
14,237
No income from relief of indebtedness for Ell Gee, Inc. $ 13,851
No year indicated. In addition respondent conceded that GTI's checking account was used by petitioner to pay expenses for other corporations after GTI went out of business and therefore petitioner is allowed the following deductions: ↩
1975
1976
1977
$ 775
* $ 13,467
$ 2,000
4. There are numerous items of income and deductions at issue. For clarity and conciseness, the particular items appear in appendices attached to the opinion. Appendix A sets forth the adjustments respondent made in his statutory notice of deficiency. Appendix B sets forth the items of disallowed deductions and previously unclaimed deductions. Appendix C sets forth the outstanding balances in loan accounts between petitioner and his corporations. ↩
5. Included within the disallowed deductions were petitioner's claimed travel and entertainment expenses. The issue of travel and entertainment expenses is exceedingly convoluted. Respondent has disallowed all travel and entertainment except certain expenses associated with the operation of Climax Theater in North Carolina. All of the rest of petitioner's expenses claimed as travel and entertainment are still at issue, as is $ 599.48 associated with the operation of the Climax Theater. Moreover, petitioner now claims that many of the travel and entertainment expenses were erroneously deducted as such but that they were nevertheless deductible. To the extent petitioner concedes that expenses were miscategorized they are disallowed as travel and entertainment expenses. ↩
6. Petitioner argues on brief that in the event we find that Gayety Theaters is not entitled to deductions at 4460 Bay Point Rd., petitioner would be entitled to deductions for interest and taxes. ↩
7. The Court has taken much time trying to decipher what transpired in petitioner's businesses between 1974 and 1978. The parties have submitted hundreds of pages of evidence and briefs to support their respective positions. Unfortunately, neither party took much time to convey to the Court which specific exhibits and which witnesses' testimony supported their positions. On numerous occasions we were required to review the over 200 exhibits to determine whether any of the documentary evidence supported either petitioner's or respondent's claim. Needless to say there are gaps as to what transpired in petitioner's businesses during the years in issue. We have, however, done the best we could with the limited guidance offered by the parties. ↩
8. Cameo Productions, Inc. was a separate subchapter S corporation which operated the Cameo Theater in Miami Beach, Fla. until 1975. Before 1975 Cameo Productions, Inc. had more than one shareholder. In 1975 petitioner became its sole shareholder, and Cameo Theater was then operated by Griffco. ↩
9. Petitioner received a salary of $ 35,000 in 1974. He did not receive a salary in 1975 through 1978. During 1974 through 1978 petitioner did not net any subchapter S income because his reported losses and carryovers of net operating losses from loss corporations exceeded the gains earned in petitioner's profitable corporations. ↩
10. The disarray of petitioner's books makes it impossible for the Court to determine exactly how much money was either loaned to petitioner or borrowed from petitioner at any particular point in time. Moreover, in many cases loans from one corporation to another corporation were filtered through petitioner's loan accounts. Thus, the circuity of the transactions presents another obstacle in our determination of how much money was contributed or invested by petitioner. ↩
11. Monique Productions produced the film "My Third Wife, George." The record is unclear as to petitioner's ownership interest in Monique Productions. ↩
12. Face of instrument is defined as: That which is shown by the language employed, without any explanation, modification, or addition from extrinsic facts or evidence. Investors' Syndicate v. Willcuts, D.C. Minn., 45 F.2d 900, 902. Thus, if the express terms of the paper disclose a fatal legal defect, it is said to be "void on its face." * * * [Black's Law Dictionary (1979).]
Since there is no evidence of a fatal legal defect on the "face of the instrument," the consent cannot be said to be invalid on its face. ↩
13. See discussion of Circular 230, 31 C.F.R., Part 10, 1966-1 C.B. 1171, and Rev. Proc. 68-20, 1968-1 C.B. 812, infra.↩
14. The 1 Restatement, Agency 2d, sec. 124A provides that the termination of authority does not thereby terminate apparent authority. In addition, as a general rule, the third party must receive notice in order to effectively terminate an agent's apparent authority. See 1 Restatement, Agency 2d↩, secs. 125-132. Additionally, the Internal Revenue Service has issued rules on the revocation of power of attorney. The rules require the taxpayer to send a signed statement to those offices of the Internal Revenue Service where the taxpayer has filed copies of the power of attorney which is to be revoked listing the names and addresses of the representatives whose authority is revoked. Section 601.505(c)(2), Statement of Procedural Rules. 15. Petitioner could have used the Court's discovery rules to obtain a more definite basis for respondent's determination. ↩
16. Respondent maintains inconsistent positions regarding the film expenses paid by the corporations to GTI. In docket No. 22089-80 respondent disallowed all the film expenses paid to GTI after it filed its final return on March 31, 1975, on the ground that GTI was defunct after that time. However, in docket No. 4032-85, respondent asserts that petitioner is liable as transferee of GTI and he includes all of the amounts paid as film expenses by the corporations in the gross income of GTI in 1975, 1976 and 1977. ↩
17. See Jolar Cinema, Inc. v. Commissioner,T.C. Memo. 1983-403↩. 18. We have considered how many theaters were in operation to determine the amount of allowable film deductions. The theaters were owned by petitioner's wholly owned S corporations. Therefore, the total $ 52,000 per year deduction for films is allocated between the corporate owners. ↩
19. Petitioner's argument on these previously unclaimed auto expenses is very vague and general. We are unsure of exactly what amount of previously unclaimed deductions he is presently claiming. ↩
20. Under Cohan v. Commissioner,39 F.2d 540↩ (1930), we are empowered to make an allowance for local transportation based on an estimate if we are convinced the expense was actually incurred and a basis exists to estimate the deduction. In this case petitioner has failed to provide us with such a basis. 21. Petitioner also failed to address the self-employment issue. He did address the substantive income issue which we decide against him. We take his failure to raise the self-employment issue in the alternative to be a concession of the self-employment tax. ↩
22. We note that although the loan payments themselves are not deductible, $ 7,500, which constituted the interest over the term of the loan, is deductible if it was not previously claimed. ↩
*. The stipulation specifies that petitioner deducted taxes and interest on the property in 1974. It is unclear from the record and Gayety's tax returns whether taxes and interest on the residence were deducted in 1975 through 1978. The stipulation also specifies gas and electric were disallowed to the extent of $ 1,737 in 1977. According to the information contained in the stipulation, however, the gas and electric bills totalled only $ 1,731.87. Therefore, the deduction cannot be disallowed for an amount greater than $ 1,731.87. ↩
23. Sec. 280A↩, which is applicable for the 1976 through 1978 tax years, would preclude us from making an allocation between business and personal use without a showing of exclusive business use for a portion of the home for those years. 24. See n. 23, supra.↩
25. Since there is no evidence that petition paid off the accrued rental expenses the "payment' is evidenced by an increase in income which flowed through to him as sole shareholder of Gayety. ↩
26. Respondent has not raised the issue of whether petitioner received additional income for the rental value of the home in 1977 and 1978, years in which he paid no rent in any form. As a result, we make no such finding. ↩
27. Former sec. 1374 as in effect during the years in issue provided: CORPORATION NET OPERATING LOSS ALLOWED TO SHAREHOLDERS. Sec. 1374 [1954 Code]. (a) GENERAL RULE. -- A net operating loss of an electing small business corporation for any taxable year shall be allowed as a deduction from gross income of the shareholders of such corporation in the manner and to the extent set forth in this section. (b) ALLOWANCE OF DEDUCTION. -- Each person who is a shareholder of an electing small business corporation at any time during a taxable year of the corporation in which it has a net operating loss shall be allowed as a deduction from gross income, for his taxable year in which or with which the taxable year of the corporation ends (or for the final taxable year of a shareholder who dies before the end of the corporation's taxable year), an amount equal to his portion of the corporation's net operating loss (as determined under subsection (c)). The deduction allowed by this subsection shall, for purposes of this chapter, be considered as a deduction attributable to a trade or business carried on by the shareholder. (c) DETERMINATION OF SHAREHOLDER'S PORTION. -- (1) IN GENERAL. -- For purposes of this section, a shareholder's portion of the net operating loss of an electing small business corporation is his pro rata share of the corporation's net operating loss (computed as provided in section 172(c), except that the deductions provided in part VIII (except section 248) of subchapter B shall not be allowed) for his taxable year in which or with which the taxable year of the corporation ends. For purposes of this paragraph, a shareholder's pro rata share of the corporation's net operating loss is the sum of the portions of the corporation's daily net operating loss attributable on a pro rata basis to the shares held by him on each day of the taxable year. For purposes of the preceding sentence, the corporation's daily net operating loss is the corporation's net operating loss divided by the number of days in the taxable year. (2) LIMITATION. -- A shareholder's portion of the net operating loss of an electing small business corporation for any taxable year shall not exceed the sum of -- (A) the adjusted basis (determined without regard to any adjustment under section 1376 for the taxable year) of the shareholder's stock in the electing small business corporation, determined as of the close of the taxable year of the corporation (or, in respect of stock sold or otherwise disposed of during such taxable year, as of the day before the day of such sale or other disposition), and (B) the adjusted basis (determined without regard to any adjustment under section 1376 for the taxable year) of any indebtedness of the corporation to the shareholder, determined as of the close of the taxable year of the corporation (or, if the shareholder is not a shareholder as of the close of such taxable year, as of the close of the last day in such taxable year on which the shareholder was a shareholder in the corporation). In 1982 Congress revised the rules pertaining to subchapter S corporations in the Subchapter S Revision Act of 1982, Pub. L. 97-354, 96 Stat. 1669. The revisions in the 1982 Act do not apply in this case, however, because they apply only to taxable years beginning after December 31, 1982. Section 6(a), Subchapter S Revision Act of 1982, Pub. L. 97-354, 96 Stat. 1669, 1697. ↩
28. Secs. 1301-1305 were repealed by the Tax Reform Act of 1986, Pub. L. 99-514 sec. 141(a), 100 Stat. 2117. ↩
29. We note that respondent is authorized to make adjustments to the carrybacks of the 1972 ITC because the ITC carryback is attributable to an NOL carryback. See sec. 6501(j); Herman Bennett Co. v. Commissioner,65 T.C. 506, 509-510↩ (1975). 30. Since there is no transferee liability, the deficiency respondent determined for fraud is also obviously nonexistent. ↩
31. We made no factual finding as to the true character of any shareholder loans other than those outstanding with GTI in 1974 and 1975 because such findings were not determinative as to any particular deficiency issue. ↩